Robert C. Watson, d/b/a Air Charter Service, Plaintiff-Appellee, *v.* Byerly Aviation, Inc., Defendant and Third-Party Plaintiff-Appellant—(Standard Steel, Division of Baldwin-Lima-Hamilton Corp., Third-Party Defendant-Appellee.)

(No. 71-144;

Third District—October 12, 1972.

*Rehearing denied November 6, 1972.*

John F. O'Meara, of Chicago, and McConnell, Kennedy, McConnell & Morris, of Peoria, for appellant.

Lyle W. Allen and David A. Nicoll, both of Peoria, for appellant.

Mr. PRESIDING JUSTICE STOUDER delivered the opinion of the court:

Plaintiff, Robert Watson, d/b/a Air Charter Service, Appellee, brought this action in the Circuit Court of Peoria County to recover for damage to his airplane from Defendant, Byerly Aviation, Inc., Appellant. Byerly Aviation filed a third party action against Standard Steel, Division of Baldwin-Lima-Hamilton Corporation, Third Party, Defendant-Appellee. At the close of all the evidence the court granted Standard Steel's motion for directed verdict and entered judgment in favor of the Third Party Defendant on the Third Party action. The court denied Byerly Aviation's motion for directed verdict and when the jury returned a verdict in favor of Watson against Byerly Aviation for $50,000, the court entered judgment on the verdict. Post trial motions as to both judgments were denied by the court and are the basis of this appeal.

On July 17, 1966, a DC-3 owned by plaintiff Watson, landed at Peoria Airport and parked on the service ramp operated by the defendant, Byerly Aviation. The pilot of the plane, Miller and the co-pilot Hann, were both employed by the third party defendant, Standard Steel. The passengers on the plane disembarked and the co-pilot secured the plane. The pilot ordered fuel from a lineman of Byerly Aviation by saying either "refuel the main four tanks" or "top off the four mains". The pilot and co-pilot then left the ramp area and went to the terminal building to get something to eat.

The DC-3 was a twin engine plane, having a total of six fuel tanks. In each wing there were two fuel tanks located inboard between the engine and the fuselage, and one located outboard of the engine. The forward inboard tank was known as the main tank. The rear inboard tank was known as an auxiliary tank. The two inboard tanks may also have been known as main tanks. The outboard tank was known as the long range outboard auxiliary tank.

Two linemen employed by defendant Byerly Aviation, Malone and Gossick, were there to service the plane. Malone did the fueling. He had worked on the line for a couple of weeks before this date and had worked occasionally in the evenings for several months before that. He was not an airplane mechanic; he did have a private pilot's license, and he was working towards obtaining a commercial pilot's license. Malone began fueling the right outboard long range auxiliary tank. In the course of this operation Gossick observed fuel leaking out of the bottom of the center section of the right wing. Gossick called Malone's attention to this fact and the fueling was stopped. Malone and Gossick notified Walter Staker, a vice-president of Byerly Aviation and Staker opened approximately 10 inspection plates in the bottom of the right wing to allow the fuel to escape and evaporate.

The pilot and co-pilot were gone approximately a half hour. When they returned the Byerly personnel told them about what had happened and pointed out the area where gasoline was leaking. At that time gasoline was still dripping and the area below the wing was damp from gasoline that had already fallen. Gasoline fumes also could be smelled. The bill for gasoline was paid and 87 gallons put in the right outboard auxiliary tank were taken off the bill.

There was no urgency requiring the crew to leave. The inspection plates were closed up by the pilot with Staker's assistance. The pilot and co-pilot stood outside the plane for 15 or 20 minutes. The co-pilot made no attempt to locate the source of the leak. The pilot and co-pilot did confer as to the advisability of taking off with the airplane.

The pilot and co-pilot then got abroad, at which time gasoline was still

leaking. Miller started the engines. When the engines were started there was an "afterfire" and then an explosion. The DC-3 was equipped with Pratt & Whitney radial engines which have a tendency to "afterfire". The afterfire is caused by an excessive amount of fuel in the cylinders. Excessive fuel can be introduced into the cylinder by the pilot starting the engine with the fuel selector in the rich position when it should be in the idle cut off position, or by moving the fuel selector from the idle cutoff position to the rich position too quickly or by excessive priming. The excess fuel goes out the exhaust pipes as flame and exits outboard of the engine and beneath the wing.

The explosion ripped the rear center sections of both wings and caused fire damage to the fuselage. After the occurrence Robert Oelker, an investigator for the National Transportation Safety Board, made an investigation and inspected the aircraft.

The right outboard auxiliary tank had a fuel line running from the tank to the cockpit. The line was metal for the most part. However, at a point in the rear center section of the wing in the area of the damage, the line made a 90 degree turn. At that point a connector hose made of rubber tubing was utilized.

Oelker's tests showed that fluid ran out of the line at that point. Closer examination showed that there was a crack which measured one and three quarters inches diagonally on the exterior of the hose and approximately one inch of the same crack was exposed and open on the inside of the hose. Testing and examination of all other parts of the fuel system showed no defects.

The plaintiff, Watson, testified that he was hired by Standard Steel in 1962 and was employed as chief pilot for that company. In that capacity he supervised the pilots who flew the plane and the mechanics who serviced it. He testified that if the outboard auxiliary tanks were not used periodically, the lines and the seals for them would dry out and deteriorate. He initially testified that he verbally instructed the pilots to use the outboard auxiliary tanks for that reason. After his deposition testimony was read he testified that no verbal instructions were issued as such "it was just common knowledge among us all that we kept them fueled out there to keep the seals and hoses and valves wet, otherwise they will dry out and deteriorate". He could not remember when he last used the outboard tanks. To the best of his knowledge there was gasoline in them when he flew the plane the day before the occurrence. However, he admitted that he could not remember looking at the fuel gauge which was the way he could tell if gas was in those tanks.

The co-pilot of the plane, Hann, testified that to his knowledge the outboard auxiliary tanks were never used at all. He had been employed

for six months before the occurrence and had flown the plane 30 to 50 times and had never filled the tanks. He also testified that if all six tanks were used the plane would be at its full gross weight capacity.

The plaintiff, Watson, testified that he had certificates from the Federal Aviation Agency and the Public Utility Commission of the State of Pennsylvania as an air taxi operator doing business as Air Charter Service. He had become employed as chief pilot for Standard Steel in 1962. In 1964 he purchased the DC-3 and entered into a verbal "lease" with Standard Steel for the use of that plane. Prior to May 1, 1966, Watson hired the pilots and mechanics who flew and serviced the plane. On May 1, 1966, those persons were transferred to the payroll of Standard Steel. From that time on over 99 percent of Watson's flights were performed in the service of Standard Steel.

As chief pilot for Standard Steel, Watson's duties included supervising the scheduling of the aircraft and the maintenance of the aircraft. He supervised the entire flight operation.

At the time of the fire the plane was valued at $65,000. It was repaired at a cost of approximately $36,000 and was out of service for approximately fifteen months. The jury awarded plaintiff $50,000.

On this appeal defendant's primary assignment of error is that the act of its linemen in putting gasoline into the wrong tank did not as a matter of law constitute negligence proximately causing the damage to plaintiff's plane. As a corollary to this argument it is defendant's contention that under the circumstances the damage was the direct and proximate result of improper maintenance of the plane or pilot Miller's conduct.

■■ In support of the judgment plaintiff argues the explosion and fire on the plane were proximately caused by defendant's wrongful conduct in filling the wrong tank. It is a well settled rule of causation that if the negligence does nothing more than furnish a condition by which the injury is made possible and that condition causes any injury by the subsequent act of a third person, the two are not concurrent, and the existence of the condition is not the proximate cause of the injury. (*Seith v. Commonwealth Electric Co.*, 241 Ill. 252, 89 N.E. 425; and *Jerlik v. Missouri Pacific R.R. Co.*, 13 Ill.App.2d 518, 142 N.E.2d 708.) Following and approving *Seith v. Commonwealth Electric Co., supra*, the court in *Merlo v. Public Service Co.*, 381 Ill. 300, 45 N.E.2d 665, observed, "The test that should be applied in all cases in determining the question of proximate cause is whether the first wrongdoer might have reasonably anticipated the intervening cause as a natural and probable result of the first party's own negligence. * * * If the act of a third party is the immediate cause of the injury and is such as in the exercise of reasonable diligence would not be anticipated and the third person is not under the control

of the one guilty of the original wrong, the connection is broken and the first act or omission is not the proximate cause of the injury." See also *Storen v. City of Chicago*, 373 Ill. 530, 27 N.E.2d 53; and *Crawford v. Central Ill. Public Service Co.*, 235 Ill.App. 339.

In this case the pilot gave instructions to the defendant's linemen for refueling the plane. Neither Malone nor Gossick testified, it appearing they were no longer employed by defendant and resided out of the state. Even though there is some evidence the instructions given by the pilot were ambiguous the parties concede and assume there is ample evidence from which it may be inferred that the linemen in fueling the outboard auxiliary tank put gasoline in the wrong tank. The misconduct charged was the act of filling the wrong tank and not any improper conduct in the manner of filling the tank. According to the plaintiff's theory, Malone filled the wrong tank, the gasoline spilled out, and finally the gasoline caught fire. As disclosed by the chain of events and the surrounding circumstances there are two aspects of the factual situation relevant to our consideration of the applicability of the rules of proximate causation.

The first relates to the cause of the gas spillage from the tank. It is undisputed that the gas leaked out of a break in the fuel line. Whether such break in the fuel line was or should have been foreseen or anticipated if the tank was filled contrary to instructions raises a question of causation which we do not deem it necessary to decide because of our views as hereafter discussed regarding a more serious question. The plaintiff's position in his brief regarding this aspect of the case is untenable. According to the plaintiff's brief, "The reason for the leak in the gasoline leading from the right outboard auxiliary tank has no relevance to the issues at hand. Neither the blame for such leak, nor the knowledge thereof, is placed on anyone." The reasons for or the causes of the break in the fuel line which permitted the leakage of gasoline which otherwise would not have occurred are essential considerations in determining foreseeability. This brings us to the question of the proximate cause of the fire. Did the pilot's conduct constitute an independent intervening efficient cause of the fire and hence not foreseeable as a consequence of putting gas in the wrong tank? Or was the pilot's conduct such that it could or should have been foreseen as a natural consequence of putting gas into the wrong tank?

■■ The Federal Aviation Regulations impose the responsibility of determining the airworthiness of the aircraft on the pilot. Sec. 91.29, 14 C.F.R. provides, "(a) No person may operate a civil aircraft unless it is in an airworthy condition. (b) The pilot in command of an aircraft is responsible for determining whether that aircraft is in condition for safe flight. He shall discontinue the flight when unairworthy mechanical or

structural conditions occur." See also, *Lock v. Parkard Flying Service, Inc.,* 185 Neb. 71, 173 N.W.2d 516; *Black v. United States* (5th Cir. Tex. 1971), 441 F.2d 741; and *Michelmore v. United States* (D.C. Cal. 1969), 299 Fed. Supp. 1116, and *Wiggins v. Hughes Tool Co.* (Nev. S.C.), 484 P.2d 566.

In *Lock v. Packard Flying Service, Inc., supra,* plaintiff brought suit for injuries she sustained when her husband took his rudderless plane from the defendant's repair shop and attempted to fly it. The ignition key was in the plane, and the defendant did not warn that the rudder had been removed. The pilot did not make a pre-flight inspection. In holding that the defendant was not liable the court noted the Federal Aviation regulations and stated: "The evidence discloses that the pilot of the plane was clearly negligent in failing to ascertain that it was airworthy and in flying a craft that was obviously disabled. This is not a case of a concealed or hidden defect or one of which the pilot might reasonably have been expected not to discover. The negligence of the pilot occurred subsequent to the removal of the rudder by defendant. Defendant's removal of the rudder and failure to give warning of the consequent disability of the aircraft was not the proximate cause of the accident. 'Two acts of independent source are not concurrent in causing an injury if one of them merely furnishes a condition by which such injury is made possible, and later such injury occurs through the efficient, self-acting, and independent operation of the other.' "

In *Black v. United States, supra,* the flight service station operator was found to have failed to advise the pilot of the plane of severe weather he would encounter. The Appellate Court reversed a judgment against the government stating, "The failure of the operator to warn the pilot of the presence of the storm in his path cannot be regarded as a continuing proximate cause after the pilot himself discovered its presence, appreciated the danger and decided to fly into it. To rule out an appreciation of danger disregards the pilot's weather training and 600 hours of flying experience. Any contributing effect of the operator's negligent failure was replaced by the negligent action of the pilot when he saw but did not heed the warning of the actual presence of the storm itself."

■■ In this case when the pilot and co-pilot returned to the plane they were informed of what had happened and saw for themselves what was happening. At the time the inspection plates on the lower surface of the wing were off and they saw the gasoline leakage. The pilot replaced the inspection plates and thereafter he and the co-pilot stood around for about fifteen minutes watching and deliberating on their course of action. Gasoline was still dripping and its fumes were still strong when the pilot decided to take off and started the engines in such a manner so as to

cause an afterfire in the motor exhaust system and thereafter an explosion and fire in the plane. The pilot had been completely informed of what had happened, was aware of the existing conditions and appreciated the nature or extent of the hazard involved. Nevertheless as the person having the authority to decide and determine a course of action he undertook to start the plane after a significant period of deliberation and consideration. It is our conclusion that the consequences of the defendant's conduct in filling the wrong tank terminated at least at the point where the pilot and co-pilot had been fully advised of what had happened. The decision which they made thereafter was an independent decision not subject to the control of the defendant or foreseeable as a consequence of the linemens' conduct.

Defendant's argument generally ignores the conduct of the pilot and co-pilot, relying on the fact that since gasoline was involved in the fire the pilot's conduct was irrelevant. Whether the pilot's conduct be regarded as negligence or not is of course immaterial since if it be the efficient cause of the fire not foreseeable as a consequence of filling the wrong tank it need not be determined whether the pilot's conduct was wrongful or not.

The principal cases relied on by plaintiff are not we believe of persuasive anology. In *Standard Oil of Kentucky v. Evans,* 154 Miss. 475, 122 So. 735, it was held that a motorist did not assume the risk of negligence of a gasoline seller in overflowing the tank in his automobile since the seller should reasonably have foreseen that the overflow of gasoline might become ignited in some manner, resulting in injury to the motorist and damage to his automobile. It was held that whether the seller's negligence in overflowing the tank of the automobile was the proximate cause of the fire and injuries to the motorist depended upon whether the seller should reasonably have foreseen that some injury might result therefrom, not necessarily the particular one which did follow. The seller was held charged with knowledge that gasoline is highly inflammable, and that the motorist's contributory negligence in driving the automobile, the tank of which the seller's gasoline had overflowed when filling it, would not defeat the motorist's right to recover for the seller's negligence, but would go only in mitigation of damages. We believe the foregoing case is distinguishable from the case at bar in several respects. First of all the duties imposed upon the pilot are substantially different then those relating to the driver of an automobile. Second, the decision of the pilot to proceed was a deliberate decision made after appropriate consideration and involved a decision to proceed in the face of a known and obvious hazard. Third, the opinion is not especially a causation case and the conclusion of the court regarding contributory negligence and

mitigation of damages indicate considerations not applicable to the case at bar.

In *Kern v. Bumpas* (La. App.), 102 S.2d 263, the defendant service station was held liable where it appeared that he had failed to securely tighten the drain plug after an oil change, the motor freezing up after it had been driven some 25 miles. The foregoing case from its facts presents no question of an intervening cause since it does not appear that the driver drove the car with any knowledge that the drain plug had not been replaced or that the motor was without oil.

In holding as we do that the pilot's conduct was an independent efficient cause of the plaintiff's damage and that there was a discontinuity in the consequences of the original wrongful act we believe it appropriate to discuss some other aspects of this case which may account in part for the error of the court below.

Plaintiff filed his complaint in three counts, the first charging specific negligence, the second charging general negligence based on bailment and the third charging general negligence based on *res ipsa loquitur*. The trial court dismissed the *res ipsa* count and the propriety of such ruling is not presented on this appeal. However the court did instruct the jury on both the specific negligence and general negligence-bailment counts of the complaint. On this appeal defendant has in addition to the causation argument assigned as error the court's determination that the relationship between Watson and Byerly Aviation was that of bailor-bailee and the defendant has also insisted that the instructions relating to bailment were erroneously given.

■■ Whether the relation between parties be vendor-vendee, business invitor-business invitee, or bailor-bailee, it is the duty of the vendor, business invitor or bailee (where the bailment is for the mutual benefit of both parties) to exercise reasonable care under the circumstances. Thus so far as duty, breach, causation and damages are concerned it makes no difference whether the defendant in this case be regarded as a vendor or bailee. For that reason our conclusion that the defendant's breach of duty did not proximately cause the injury is equally applicable whether or not the defendant be regarded as bailee.

Although we find it unnecessary to decide whether the relationship between plaintiff and defendant was that of bailor, bailee the instructions which were given as a result of this determination could only have caused confusion and obscured the real issues of the case.

■■ The often repeated rule in a bailment case is that if the plaintiff prove the agreement, express or implied, the delivery of the property to the bailee in good condition and its non return or redelivery in a damaged condition the plaintiff has made out a *prima facie* case. Although such

*prima facie* case is sometimes referred to as a presumption of negligence this is more a manner of speech than a legal proposition. As a concomitant to the *prima facie* rule where a *prima facie* case is made out it then becomes incumbent upon the defendant to produce and present evidence of his due care and if he fails to do so the *prima facie* case is sufficient to justify a judgment for the plaintiff. Where the defendant has satisfied his duty or obligation of producing evidence in opposition to the *prima facie* case sufficient to make his specific negligence an issue in the case, the burden to prove defendant's negligence by a preponderance of the evidence is that of the plaintiff and the elements which go to make up a *prima facie* case are not evidence of negligence. (*Clark v. Fields*, 37 Ill.2d 583, 229 N.E.2d 676.) In the case at bar the jury was in effect instructed that the plaintiff was entitled to recover if he proved the elements necessary to make out a *prima facie* case. At the same time with respect to the count based on specific negligence the jury was instructed that the plaintiff could recover only upon proof by a preponderance of the evidence of the specific negligence charged. As heretofore observed the negligence of the defendant was the issue in the case vigorously contested by the defendant and consequently the *prima facie* bailment rule or its presumption of negligence corollary should have no place in the decision of the case. The *prima facie* rule in bailments is not a rule of evidence but rather a rule of procedure to be applied where the evidence is insufficient to raise a controverted issue of negligence. Even though negligence is the gist of this action the instructions confused the issues to be determined by the jury and permitted the jury to find liability under the bailment theory even though they might not have believed defendant guilty of negligence as charged in other instructions relating to the specific negligence count.

Defendant has made other assignments of error relating to instructions and to the court's ruling directing a verdict against it on its third party action. In view of our conclusion that the court erred in denying defendant's motion for judgment notwithstanding the verdict we find it unnecessary to consider these issues.

For the foregoing reasons the judgment of the Circuit Court of Peoria County in favor of Robert Watson, d/b/a Air Charter Service against Byerly Aviation is reversed and the judgment against Byerly Aviation on its third party action is affirmed.

Judgment reversed in part and affirmed in part.

SCOTT and DIXON, JJ., concur.