JAMES O. PEOPLES, Plaintiff-Appellant and Appellee, *v.* GRANITE CITY STEEL COMPANY, Defendant-Appellee.—(Granite Sheet Metal Works, Defendant-Appellant, Counterclaimant-Appellant, and Third-Party Plaintiff-Appellee; The Carborundum Company, Defendant-Appellant, Counterdefendant-Appellee, and Third-Party Plaintiff-Appellant; G. H. Sternberg & Company, Third-Party Defendant-Appellant and Appellee.)

Fifth District No. 81—34

Opinion filed September 14, 1982.—Rehearing denied October 15, 1982.

William G. Kaseberg, of Bernard, Davidson and Kaseberg, of Granite City, for Carborundum Company.

Robert D. Francis, Howard Boman, and Russell K. Scott, all of Dunham, Boman and Leskera, of East St. Louis, for Granite Sheet Metal Works.

John F. O'Connell, of O'Connell and Waller, of Belleville, for G. H. Sternberg & Company.

Law Offices of William W. Schooley, of Granite City, for James O. Peoples.

Bernard H. Bertrand, of Wagner, Bertrand, Bauman and Schmieder, of Belleville, for Granite City Steel Company.

JUSTICE WELCH delivered the opinion of the court:

On October 10, 1977, plaintiff James Peoples was employed as an ironworker on a pollution control project at Granite City Steel Company (Granite City). To comply with government standards, Granite City contracted with the Carborundum Company (Carborundum) to construct a facility which would collect pollutants given off from its basic oxygen furnace. Carborundum, in turn, subcontracted with Granite Sheet Metal Works (Sheet Metal) to erect the structural steel, baghouses, bags, duct work and much of the dust collection system at the facility. Sheet Metal orally subcontracted all of the structural steel work to G. H. Sternberg and Company (Sternberg), which directly employed the plaintiff.

That day, the plaintiff was working with fellow ironworker Pat Haggerty attaching horizontal beams and diagonal braces to vertical steel supports. Haggerty and the plaintiff had finished attaching the top horizontal beam, at about 20 or 25 feet above ground level, and

two diagonal braces were the next pieces to be installed. The plaintiff climbed to the top of the vertical support, inserted a bolt to attach the brace to the support, and threaded the bolt down one full nut. Haggerty, working on the first horizontal beam down from the top, attempted to secure the other end of the brace in a similar manner, but the brace was several inches short. Jack Drennan, Sternberg's foreman for the ironworkers, who was on the ground, instructed Haggerty to rest the bottom of the brace on the horizontal beam, and it would be modified and attached later.

Haggerty and the plaintiff then started to fasten the remaining brace. The plaintiff descended to the horizontal beam on which Haggerty had been working, while Haggerty climbed to the top of the vertical support. Haggerty secured the top end of the second brace with a bolt, but the brace would not fit at the plaintiff's end. The plaintiff called to the workers on the ground for a C-clamp to attach the brace, and one was brought up to him. As the plaintiff was installing the clamp, the first brace, which had been left unattached on the beam, scissored and struck the plaintiff in the back, knocking him to the ground. He sustained injuries to his right shoulder and wrist.

The plaintiff brought suit in the Circuit Court of Madison County against Granite City, Carborundum and Sheet Metal. The action was based upon alleged violations of the Structural Work Act (Ill. Rev. Stat. 1981, ch. 48, par. 60 *et seq.*). Carborundum and Sheet Metal each filed a third-party complaint against Sternberg for indemnity, and Sheet Metal brought a counterclaim for indemnity against Carborundum. All of these actions were submitted to a jury, and judgment was entered on their verdict in all respects. The plaintiff's damages were assessed at $150,000, and, in the plaintiff's original action, judgment was given in favor of the plaintiff against Carborundum and Sheet Metal, but in favor of Granite City against the plaintiff. Sheet Metal was allowed reimbursement from Sternberg, but not from Carborundum. Carborundum was denied reimbursement from Sternberg. The jury found, in answer to a special interrogatory, that Carborundum's conduct constituted major fault which proximately caused the plaintiff's injuries.

From these judgments, the plaintiff, Carborundum, Sheet Metal and Sternberg have appealed. Although the arguments vary from party to party, the assignments of error basically involve the sufficiency of the evidence and the propriety of certain closing arguments. Essentially, this cause presents six separate appeals, which are as follows: (1) The plaintiff appeals from the judgment against him in favor of Granite City. (2) Sheet Metal appeals from the judgment against it

in favor of the plaintiff. (3) Carborundum appeals from the judgment against it in favor of the plaintiff. (4) Carborundum appeals from the judgment denying it reimbursement from Sternberg. (5) Sheet Metal appeals from the judgment denying it reimbursement from Carborundum, and (6) Sternberg appeals from the judgment which allowed Sheet Metal reimbursement from it. For convenience we shall discuss each of these appeals separately and in the order established above.

## APPEAL OF PLAINTIFF AGAINST GRANITE CITY

In his appeal, the plaintiff argues that the trial court should have entered judgment in his favor and against Granite City, notwithstanding the jury's verdict. He points to several factors which he claims establish Granite City's liability to him under the Structural Work Act.

According to the terms of its contract with Carborundum, Granite City reserved the right to approve Carborundum's superintendent and any subcontractors it engaged. Before it began work, Carborundum was to notify Granite City of its intention to do so, the nature, location and duration of the work, the number of personnel to be employed "and such other information as may be necessary to enable [Carborundum] to be advised of and to comply with all plant protection rules and regulations." At a prejob safety orientation meeting, Granite City employees presented to the contractor and subcontractors Granite City's supervisory safety manual for noncompany construction, which included those rules and regulations with which the contractor and subcontractors were expected to comply. The supervisory safety manual stated that all contractors who sublet their work would be responsible for safety matters involving the subcontractor, and it incorporated by reference the Manual of Accident Prevention in Construction, of the Associated General Contractors of America, Inc. The Manual of Accident Prevention provided in paragraph 2—6 that:

> "Safety belts should be worn by employees working at elevated levels which are not protected by handrails or when working from suspended scaffolds. Belts should be secured to a structural members [sic] or to a line independent of the scaffold rigging. The support member should be strong enough to support the weight of the man if he falls."

Alvin Miller, general supervisor for Granite City's construction engineering department, testified that he visited the construction site almost daily, for between 15 minutes and a couple of hours. Granite City's Dick Jung, also of the construction engineering department, was described by another witness as having been on the job "frequently." Miller was not present when the plaintiff was injured, and

Jung did not testify at trial.

According to Miller, if he saw a safety violation such as a workman without a hardhat or safety goggles, he would bring this to the attention of John Peluso, who was the project coordinator for Carborundum. In his inspections of the job site, Miller was aware that some of the structural steel was not fitting properly, although he did not testify that he knew that some of the steel was temporarily left in place without being fastened. Miller interpreted the contract between Carborundum and Granite City to allow Granite City to reject any structural steel it found unsuitable. David Partney, Sheet Metal's vice-president, testified that the approval of Carborundum's Peluso, not that of Miller or Jung, was required before the steel could be modified.

The plaintiff and Haggerty recalled that they did not receive any instructions from any of Granite City's personnel. Even if such instructions had been given, the plaintiff said, he would not have accepted them unless those instructions came through his direct superiors at Sternberg. The plaintiff also testified that he was unfamiliar with any Granite City employees on that job.

The plaintiff contends that this degree of involvement by Granite City should establish its liability to him under the Structural Work Act. Certainly, the evidence tends to suggest that Granite City was one of those parties "in charge of" the work for purposes of that Act. (*Norton v. Wilbur Waggoner Equipment Rental & Excavating Co.* (1979), 76 Ill. 2d 481, 394 N.E.2d 403; *Emberton v. State Farm Mutual Automobile Insurance Co.* (1978), 71 Ill. 2d 111, 373 N.E.2d 1348.) But, in returning a general verdict in favor of Granite City, the jury could have determined that Granite City was not in charge of the work, or that it had not wilfully violated the Structural Work Act, or that it was neither in charge of the work nor had it wilfully violated the Act. *Moulton v. Shell Oil Co.* (1976), 38 Ill. App. 3d 524, 347 N.E.2d 825.

 █ wilful violation of the Structural Work Act occurs when one having charge of the work knows that a dangerous condition exists on a scaffold, or, by the exercise of reasonable care could have discovered the existence of the dangerous condition. (*Lyle v. Sester* (1981), 103 Ill. App. 3d 208, 430 N.E.2d 699.) The question of wilfulness is primarily for the jury. (*Katz v. Shaf Home Builders, Inc.* (1981), 94 Ill. App. 3d 526, 418 N.E.2d 822.) In the case at bar, the jury could have found that the Act was violated by the failure to secure the cross brace, but that this violation was not wilful on the part of Granite City. Although there is testimony that cross braces had

previously been left unfastened on other portions of the structural steel, there is no indication of how often this practice had been followed before the plaintiff was injured. Nor was it shown that Miller or any other Granite City employee knew of this practice. Moreover, Granite City had cautioned Carborundum, in the original contract, to be attentive to job safety problems, including those which occurred in the work of all its subcontractors, and Carborundum had a full-time project coordinator on the job, who, along with the representatives of the subcontractors, had been instructed to comply with Granite City's rules. Given that these personnel were involved with discovering and preventing safety hazards, the jury could have found that it was reasonable for Granite City not to have learned that the Structural Work Act was being violated. Because the evidence introduced at trial presented a jury question, at least concerning the wilfulness of Granite City's conduct, the trial court did not err in failing to enter judgment for the plaintiff notwithstanding the verdict.

APPEAL OF SHEET METAL AGAINST PLAINTIFF

Sheet Metal advances two arguments to justify reversal of the judgment in favor of the plaintiff against it. First, Sheet Metal contends that the jury's verdict in favor of the plaintiff was contrary to the evidence at trial. Second, it is argued that plaintiff's rebuttal argument denied Sheet Metal a fair trial.

David Partney, vice-president of Sheet Metal, was the only witness from that company to testify at trial. On the Granite City job, Partney was project manager for Sheet Metal. When the job first started, Partney, the only Sheet Metal employee to visit the site, did so "a couple times a day." Later, he was joined by James Berleman, who was responsible for that part of the work which Sheet Metal did not subcontract to Sternberg, although he did not visit the job site until after the plaintiff's injury.

If a piece of structural steel did not fit properly, Partney testified, Sternberg's men would usually go directly to Peluso, Carborundum's project coordinator, for further instructions. Pieces which were not corrected in the field would be sent to Sheet Metal's shop for more extensive modification. Partney stated that he was aware that much of the structural steel had not been properly fabricated.

On the day of the accident, Partney was at the job site, although he and Peluso were at lunch when the plaintiff was injured. The absence of Partney from the scene of the mishap, and the fact that Sternberg's Jack Drennan decided to rest the brace on the cross beam without consulting Partney or Peluso are two factors which Sheet

Metal argues prove as a matter of law that it did not wilfully violate the Structural Work Act.

However, as we noted in the plaintiff's appeal, the question of wilfulness is generally for the jury (*Katz v. Shaf Home Builders, Inc.*), and even though Partney did not testify that he knew that braces were being left unfastened on cross beams, Pat' Haggerty and Jack Drennan stated that this had been done in other sections of the structural steel. Since Partney was at the Granite City site for several inspections every day, in his capacity as project manager, the jury could have found that Sheet Metal could have, by the exercise of reasonable care, discovered the violation of the Structural Work Act. (*Bishop v. Crowther* (1980), 92 Ill. App. 3d 1, 415 N.E.2d 599; *Zizzo v. Ben Pekin Corp.* (1979), 79 Ill. App. 3d 386, 398 N.E.2d 382.) And, as the jury could also have found that Sheet Metal was one of those parties "in charge of" the structural steel work (*Smith v. Georgia Pacific Corp.* (1980), 86 Ill. App. 3d 570, 408 N.E.2d 117; *Domena v. Prince* (1977), 52 Ill. App. 3d 462, 367 N.E.2d 717), we will not disturb the jury's verdict.

Next, Sheet Metal argues that plaintiff's rebuttal in closing argument denied it a fair trial. Two specific remarks are complained of as prejudicial. First, plaintiff's counsel, in arguing that the defendants were unconcerned with the safety of the ironworkers, stated: "They have a safety manual. Did they use it? No. They threw it away." To emphasize his point, plaintiff's counsel then picked up the Manual of Accident Prevention in Construction and threw it to the floor. No contemporaneous objections to this conduct were made by counsel for any of the defendants, and therefore this argument has been waived for purposes of appeal. *Mulvey v. Illinois Bell Telephone Co.* (1973), 53 Ill. 2d 591, 294 N.E.2d 689; *Funk v. Venture Stores, Inc.* (1981), 94 Ill. App. 3d 115, 418 N.E.2d 498.

But we would also note that, while we disapprove of this sort of tactic in closing argument, the judgments in favor of the plaintiff, as well as the amount of damages awarded, are sufficiently supported by the evidence so as to preclude relaxation of the waiver rule. As a result of his fall, the plaintiff was out of work for six months, resulting in lost wages of between $10,000 and $12,000 and medical bills of approximately $4,500. He suffered a permanent shoulder deformity, characterized by protusion of the right clavicle, and although he regained the full range of motion in his right shoulder, there remains a possibility that surgery may be necessary if complications develop in the shoulder. The plaintiff, who is right handed, has become permanently limited in the motion of his right wrist, this limitation affecting

his ability to bend his wrist up, down and sideways, and consisting of a 50% loss of range of motion, as compared to the left wrist. For a plaintiff who is employed as an ironworker, and who testified to the difficulties he has experienced in his work as a result of his injuries, we do not believe the damages awarded to have been affected by plaintiff's counsel's rebuttal conduct.

Second, Sheet Metal observes that, also in rebuttal, plaintiff's counsel argued to the jury that:

"That is your duty in there, folks. Come in there and tell them, 'Get out there and keep those folks safe on the job.' And there's only one way to tell them. Hit the pocket book. They tried to save their money. They took Jim's money."

Counsel for Carborundum objected to this comment on the ground that punitive damages were not involved in the present action. This objection was overruled. Following this rebuttal, counsel for Carborundum moved for a mistrial based on these remarks. This motion was joined by counsel for the other defendants. It was denied.

■■ Sheet Metal contends that, by this argument, plaintiff's counsel intended to urge the jury to act as advocates for job safety, and thereby deprived it of a fair trial. It cites as authority *Ryan v. Blakey* (1979), 71 Ill. App. 3d 339, 389 N.E.2d 604, and *Hubbard v. McDonough Power Equipment, Inc.* (1980), 83 Ill. App. 3d 272, 404 N.E.2d 311. In *Ryan* and *Hubbard,* closing arguments were held to be improper, in part because they were intended to transform the jury into a consumer vigilance committee, although in *Ryan,* counsel also referred to information beyond the evidence introduced at trial and argued his personal feelings to the jury, and in *Hubbard,* counsel spent most of his closing argument impugning the honesty of the defendant's counsel and witnesses as well as the motives of the defendant.

The remarks objected to in this case do not contain any misstatements of evidence nor do they cast aspersions on the integrity of the defendant, its witnesses or counsel, nor do they inject the feelings and opinions of plaintiff's counsel into the case. While we believe that counsel's urging the jury to "tell them" to keep the workers safe is near the bounds of propriety, we cannot say that these comments constituted an appeal to the jury to decide the case in a punitive manner, without considering the law and the evidence. (Compare *Department of Conservation v. Strassheim* (1981), 92 Ill. App. 3d 689, 415 N.E.2d 1346.) Indeed, the reference to "Jim's money" might also be viewed as limiting the request of plaintiff's counsel to the compensatory damages properly recoverable in this case. Moreover, as we discussed earlier, the judgments in favor of the plaintiff are well supported by the

evidence. Viewing plaintiff's rebuttal argument as a whole, we cannot say that it was "clearly improper and prejudicial" (*Crump v. Universal Safety Equipment Co.* (1979), 79 Ill. App. 3d 202, 398 N.E.2d 188; *Jones v. Chicago Housing Authority* (1978), 59 Ill. App. 3d 138, 376 N.E.2d 26), and therefore the judgment in favor of the plaintiff and against Sheet Metal is affirmed.

### APPEAL OF CARBORUNDUM AGAINST PLAINTIFF

In its appeal, Carborundum does not challenge the sufficiency of the plaintiff's case against it. Instead, it argues that the plaintiff's closing argument denied it a fair trial. In addition to the remarks assigned as error by Sheet Metal, Carborundum takes issue with argument by plaintiff's counsel in which, it is contended, it was falsely stated that Carborundum's Peluso ordered Haggerty to leave unsecured the brace which injured the plaintiff. We have examined these remarks, which were unobjected to, and conclude that this argument merely restates the evidence that Peluso had given similar instructions to the ironworkers on previous occasions. Plaintiff's counsel did not suggest that Peluso was there to give the order which left that particular brace unfastened. Elsewhere in closing argument, he informed the jury that Drennan had given that order and that Peluso had been at lunch when the accident occurred. We find no error in these remarks, and, as we have discussed plaintiff's rebuttal argument in connection with Sheet Metal's appeal and found no reversible error, we affirm the judgment in favor of the plaintiff and against Carborundum.

### APPEAL OF CARBORUNDUM AGAINST STERNBERG

Carborundum's appeal from the judgment denying it reimbursement from Sternberg presents four assignments of error. (1) Carborundum's misfabrication of the brace which struck the plaintiff, as a matter of law, constituted only a condition by which the plaintiff's injury was made possible through the subsequent negligence of Sternberg's foreman, Drennan, and was thus not a proximate cause of the plaintiff's injuries. (2) Sternberg, as a subcontractor which held itself out as an expert in the erection of structural steel, should be estopped to assert that the misfabrication of the brace constituted major fault. (3) A directed verdict should have been granted for Carborundum on its complaint for indemnity from Sternberg, and (4) counsel for Sternberg committed reversible error in his closing argument, which compounded the errors made by plaintiff's counsel in his closing argument.

Relying upon such cases as *Merlo v. Public Service Co.* (1942), 381 Ill. 300, 45 N.E.2d 665, *Denniston v. Skelly Oil Co.* (1977), 47 Ill. App. 3d 1054, 362 N.E.2d 712, and *Watson v. Byerly Aviation, Inc.* (1972), 7 Ill. App. 3d 662, 288 N.E.2d 233, Carborundum contends that its misfabrication of the cross brace was only a condition which made the plaintiff's injuries possible through the actions of Jack Drennan. Carborundum is correct that, in order to prove that Drennan's conduct was an intervening efficient cause of the plaintiff's injuries as a matter of law, the evidence must show that that conduct was such "as in the exercise of reasonable diligence would not be anticipated" and that Drennan was not under the control of Carborundum. *Merlo v. Public Service Co.* (1942), 381 Ill. 300, 317, 45 N.E.2d 665, 675; *Vest v. City of Granite City* (1982), 106 Ill. App. 3d 36, 39, 435 N.E.2d 755, 757.

Without deciding whether Drennan was "under the control of" Carborundum, we do not believe that the facts of this case prove that Drennan's instruction to Haggerty was unforeseeable as a matter of law. Whether or not Drennan ever took any orders directly from John Peluso, the record establishes that, during the course of the work, improperly fitting braces had been left resting on cross beams, either pursuant to Peluso's express instructions or with his approval. Since this practice was, at the least, known to Peluso, it cannot be said, as a matter of law, that Drennan's instruction to Haggerty was unforeseeable. The question of proximate causation was, therefore, properly submitted to the jury. *Zizzo v. Ben Pekin Corp.*

Next, Carborundum states that Sternberg held itself out as an expert in the erection of structural steel, knew of the irregularities in the steel supplied by Carborundum and agreed to cure these irregularities, and, in reliance upon these representations, Carborundum amended its contract with Sheet Metal to be liable to it for extra charges resulting from additional work by Sternberg to correct the irregularities. These facts, Carborundum argues, should estop Sternberg from asserting that the misfabrication of the braces constituted major fault which contributed to the plaintiff's injuries.

Carborundum does not direct us to any Structural Work Act cases which employ its theory of estoppel. Nor do we understand Carborundum to argue that principles of equitable estoppel should supercede the weighing of fault traditionally applied in indemnity actions under the Structural Work Act (*Miller v. De Witt* (1967), 37 Ill. 2d 273, 226 N.E.2d 630; *Svenson v. Miller Builders, Inc.* (1979), 74 Ill. App. 3d 75, 392 N.E.2d 628), for if this were a correct statement of the law, it would seem unlikely that a subcontractor, who is employed specifically

for his expertise in the work which is the subject of the subcontract, would ever be entitled to indemnity for injuries suffered during that work, no matter how minor the fault of the subcontractor.

Simply stated, Carborundum's estoppel argument is that Sternberg's agreement to work with the defective steel, which induced Carborundum to change its contract with Sheet Metal, should bar Sternberg from asserting the misfabrication of the metal as "major fault." But even if we were to accept this application of equitable estoppel, it does not follow that Sternberg should be prevented from defending against Carborundum's indemnity action. Contrary to the tenor of the argument in Carborundum's brief, the dereliction of Carborundum stems not only from its role as a manufacturer, but also from its role as general contractor. Sternberg did not simply accept the metal from Carborundum, knowing of the misfabrication, with full authority to decide for itself on all future modifications. Instead, its personnel worked with and took instructions from John Peluso on the refabrication of the pieces. Given that Carborundum did more than improperly manufacture the brace in question, Sternberg's agreement to perform the additional modifications does not prevent it from asserting Carborundum's conduct as major fault, where the action for indemnity is based, in large part, on the decisions made by Carborundum as a general contractor.

It is further asserted by Carborundum that the court should have entered judgment for it in its third-party action against Sternberg, notwithstanding the verdict. A closely related question is whether the conduct of Carborundum constituted major fault, and although this issue also affects our resolution of Sheet Metal's indemnity action against Carborundum, we shall discuss it here.

Carborundum notes that Sternberg was specifically responsible for the erection of the structural steel, it provided its workmen with all of the tools necessary for the work, it supervised the job through its superintendent, William Tutka, its general foreman, Frank Babka, and its ironworker foreman, Jack Drennan, and it was Drennan who gave Haggerty the order to leave the brace in question resting on the cross beam. These facts, Carborundum argues, justify the entry of judgment in its favor against Sternberg.

In *Sack v. Arcole Midwest Corp.* (1961), 33 Ill. App. 2d 344, 179 N.E.2d 441, the court affirmed a judgment based on a verdict directed in favor of three general contractors against a plumbing subcontractor in an indemnity action resulting from a Structural Work Act complaint. The plaintiff, an employee of the subcontractor, was injured in a fall from a scaffold which had been furnished and erected

by the subcontractor. One of the general contractors employed a superintendent who was on the job site daily to inspect and coordinate the efforts of the subcontractors. In holding that this evidence was insufficient to prevent the direction of a verdict in favor of the general contractors, the court stated that the facts did not present "a case of joint design, construction, maintenance or use of the scaffold" by the general contractors and the subcontractor. 33 Ill. App. 2d 344, 348, 179 N.E.2d 441, 443.

Judgment was entered on a jury's verdict in favor of a subcontractor in a general contractor's Structural Work Act indemnity action, in *Jones v. McDougal-Hartmann Co.* (1969), 115 Ill. App. 2d 403, 253 N.E.2d 581. The appellate court held that the trial court erred in failing to enter a judgment in favor of the general contractor notwithstanding the verdict. The evidence supporting this conclusion was that the scaffold from which the plaintiff fell had been erected by the subcontractor, with no assistance from or involvement by the general contractor. Similarly, in *Jackson v. H.J. Frierdich & Sons, Inc.* (1971), 1 Ill. App. 3d 381, 274 N.E.2d 189, the appellate court affirmed the trial court's direction of a verdict in favor of the general contractor because the record was "without evidence of any activity" by the general contractor in connection with the construction of the scaffold.

In *National Oats Co. v. Volkman* (1975), 29 Ill. App. 3d 298, 330 N.E.2d 514, a partner of a subcontracting firm was killed while riding a permanent manlift in a building belonging to National Oats, which had engaged a prime contractor, Ehrsam, which had hired the Volkman partnership. Ehrsam's subcontract with Volkman Brothers provided that the partnership would furnish all tools, equipment and manpower for the performance of the work of the subcontract. The task of Ehrsam's sole supervisor on the job was to see that the work conformed to specifications. On these facts, the majority in the appellate court granted judgment *n.o.v.* in favor of Ehrsam and against the surviving Volkman partner.

*Nogacz v. Procter & Gamble Manufacturing Co.* (1975), 37 Ill. App. 3d 636, 347 N.E.2d 112, involved an appeal from summary judgment granted in favor of an architect and a building owner on their claims for indemnity against the plaintiff's employer, a masonry subcontractor. The depositions in support of the motions for summary judgment revealed that the subcontractor assembled the scaffold, without assistance from the owner or the architect, that the architect visited the job two or three times a week and inquired only as to the progress of the wall, and that the architect's plans did not specify any

particular type of scaffold to be used. In affirming the summary judgments, the court noted that the owner and the architect "elected to limit their participation in the construction of the building to such matters as the timely progress of the building, quality control, and the compliance with specifications of materials used." 37 Ill. App. 3d 636, 646, 347 N.E.2d 112, 119-20.

In *Kleeman v. Fragman Construction Co.* (1980), 91 Ill. App. 3d 455, 414 N.E.2d 1064, the subcontractor agreed to furnish all equipment, labor and personnel necessary to the carpentry work, including scaffolding. A rolling scaffold was not provided to the plaintiff, who was injured when shelving upon which he was kneeling gave way. The general contractor, it was said, "merely supervised and coordinated the project for the owners" and its construction superintendent "only ensured that the subcontractors performed their jobs according to specifications." (91 Ill. App. 3d 455, 465, 414 N.E.2d 1064, 1071.) A directed verdict in favor of the general contractor was upheld on appeal.

Most recently, in *Rynders v. Sangamo Construction Co.* (1982), 103 Ill. App. 3d 552, 431 N.E.2d 1357, the plaintiff, who was employed by a painting subcontractor, was injured when the plank on the scaffold on which he stood broke due to an obvious knothole on one side. The plank had been taken from a woodpile, either with permission of the general contractor or of another subcontractor not in privity with the painting subcontractor. No evidence was presented to establish the ownership of the lumber.

The appellate court reversed judgment entered on a jury's verdict in favor of the painting subcontractor and against the general contractor, and in so doing, commented that the construction, use and dismantling of the scaffold were responsibilities undertaken by the painting subcontractor, and the defective plank was selected by one of the subcontractor's employees. The general contractor's superintendent, on the other hand, did not directly supervise the painting, nor did he inspect or stand on the scaffold.

A directed verdict in favor of the second subcontractor, and against the painting subcontractor, was affirmed because the only connection of the second subcontractor with the injury was, at best, the gratuitous bailment of the plank, such bailment only giving rise to a duty to warn of known defects. There was no evidence that the second contractor knew of the knothole in the plank.

■ Through the principles derived from these cases, we can determine whether Carborundum was entitled to indemnity as a matter of law. While the failure of the general contractor to discover an un-

safe condition will not, alone, preclude a directed verdict in favor of the contractor on its indemnity action (*Lindner v. Kelso Burnett Electric Co.* (1971), 133 Ill. App. 2d 305, 273 N.E.2d 196), a greater involvement by Carborundum in the structural steel work has been shown in this case. It is undisputed that all modifications to the beams had to be approved by Carborundum's superintendent, John Peluso, and that Peluso had previously instructed Sternberg's personnel to leave improperly fitting braces resting on the cross beams, or if they would not rest there, to leave them hanging without support underneath. This is not a case of an isolated defect in the scaffolding, which was undiscovered by the general contractor. (Compare *Rynders v. Sangamo Construction Co.*) Instead, the plaintiff was injured as a result of a continuing practice which had been ordered, or, at least, approved by Peluso. We cannot say that there was no participation by Carborundum in the work which was the subject of Sternberg's subcontract (*Jones v. McDougal-Hartmann Co.*; *Jackson v. H.J. Frierdich and Sons, Inc.*) or that Carborundum limited its participation in that work to ensuring that Sternberg made satisfactory progress and that its work conformed to specifications. (*Nogacz v. Procter & Gamble Manufacturing Co.*; *Kleeman v. Fragman Construction Co.*) Carborundum's role in the structural steel work was substantial enough to render its indemnity action against Sternberg a question for the jury (*McInerney v. Hasbrook Construction Co.* (1975), 62 Ill. 2d 93, 338 N.E.2d 868), and therefore we will not disturb the jury's conclusions that Carborundum's conduct constituted "major fault" which led to the plaintiff's injuries and that Carborundum is not entitled to indemnity from Sternberg.

Finally, Carborundum argues that the closing arguments of counsel for plaintiff and counsel for Sternberg deprived it of a fair trial on its third-party complaint. We have previously considered plaintiff's closing argument in connection with the appeal of Sheet Metal against the plaintiff and the appeal of Carborundum against the plaintiff, and found that argument not to have been prejudicial. Nor do we believe that the closing argument of Sternberg's counsel, none of which was objected to by Carborundum, constitutes error, either by itself or in combination with plaintiff's argument. Consequently, we affirm the judgment in favor of Sternberg and against Carborundum.

### APPEAL OF SHEET METAL AGAINST CARBORUNDUM

Sheet Metal contends that the judgment against it on its indemnity action against Carborundum should be reversed. First, it is argued that the jury's answer to the special interrogatory, in which it

found Carborundum guilty of "major fault," is inconsistent with the general verdict in favor of Carborundum in the indemnity action, and therefore the former should control the latter. (Ill. Rev. Stat. 1981, ch. 110, par. 2—1108, formerly Ill. Rev. Stat. 1979, ch. 110, par. 65.) Carborundum does not claim that the jury's answer to the special interrogatory is consistent with their general verdict against Sheet Metal (see *Burns v. Howell Tractor & Equipment Co.* (1977), 45 Ill. App. 3d 838, 360 N.E.2d 377), but instead asserts that the jury's answer to the special interrogatory is contrary to the evidence introduced at trial and should be vacated. (*Lesperance v. Wolff* (1979), 79 Ill. App. 3d 136, 398 N.E.2d 360.) We have already determined, in connection with Carborundum's appeal against Sternberg, that the answer to the special interrogatory was not contrary to that evidence.

Carborundum argues, in the alternative, that, as the court's authority to enter judgment on the special interrogatory instead of the general verdict is only discretionary, not mandatory (Ill. Rev. Stat. 1981, ch. 110, par. 2—1108, formerly Ill. Rev. Stat. 1979, ch. 110, par. 65; *Borries v. Z. Frank, Inc.* (1967), 37 Ill. 2d 263, 226 N.E.2d 16), this court should remand the indemnity action for a new trial. We decline to exercise our authority in this manner, because we believe that the general verdict in Carborundum's favor can and should be set aside as a matter of law.

A review of the evidence pertinent to Sheet Metal's indemnity action against Carborundum shows that, unlike Sternberg, Sheet Metal did not provide tools or equipment for the ironworkers, nor did any of its personnel supervise the erection of the structural steel as did Sternberg's foreman and supervisor. In fact, David Partney testified that Sternberg unloaded the structural steel when it arrived at the job site, even though Sheet Metal's personnel unloaded the duct work and the baghouse components. According to Partney, Sternberg's workers would usually contact Peluso directly about the misfabricated steel, and, on those occasions when they would mention their problems to him, he would refer the matter to Peluso for his approval.

Partney was on the job site on October 10, 1977, but there is no testimony to indicate that he ordered or even knew of the practice of leaving braces resting unfastened on cross beams. Nor does the evidence at trial suggest that he, or Sheet Metal, were significantly involved in the construction of the structural steel, apart from their role in refabricating some of the defective pieces, and as an intermediary, on infrequent occasions, between Sternberg and Carborundum. Moreover, when the plaintiff was injured, it was Sternberg's employee, acting under the authority of Carborundum's project coordinator, who

gave the order which ultimately led to that injury.

Under the principles of the cases discussed in connection with Carborundum's appeal against Sternberg, we conclude that the judgment in favor of Carborundum cannot stand. The evidence in this indemnity action does not demonstrate that Sheet Metal was substantially involved in the design, maintenance or construction of the structural steel (*Sack v. Arcole Midwest Corp.*) even though it refabricated some of the metal in its shop. Its participation in the construction of the steel was largely limited to making modifications in the beams and ascertaining that suitable progress was being made. (*Nogacz v. Procter & Gamble Manufacturing Co.*) Neither activity, in our view, raises a jury question of Sheet Metal's connection with the particular decisions which resulted in the plaintiff's injuries. Consequently, according to the standards of *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504, Sheet Metal has proven that it is entitled to indemnity from Carborundum as a matter of law, and therefore the judgment against Sheet Metal on its third-party claim for indemnity is reversed.

APPEAL OF STERNBERG AGAINST SHEET METAL

Sternberg presents essentially three assignments of error in its appeal from the judgment granting Sheet Metal indemnity against it. First, it argues that, because the jury found Carborundum guilty of major fault while denying Sheet Metal indemnity from Carborundum, the jury impliedly found Sheet Metal guilty of major fault, and therefore Sheet Metal may not be indemnified by Sternberg. We have already resolved this argument in favor of Sheet Metal by reversing the judgment against Sheet Metal in its third-party action. Second, Sternberg asserts that Sheet Metal is guilty of breach of an affirmative duty to the plaintiff and thus may not be indemnified by Sternberg. Finally, Sternberg contends that public policy prohibits implied indemnity as granted to Sheet Metal.

In its brief, Sternberg does not claim that Sheet Metal was more actively involved in the construction of the structural steel than it, Sternberg was, but it attempts to characterize the conduct of Sheet Metal as of "the same quality" as its own, and therefore sufficient to deny Sheet Metal indemnity. Yet, Sternberg, which admits that it was in direct charge of the erection of the structural steel, does not point to any affirmative action taken by Sheet Metal which violated the Structural Work Act. Sheet Metal's transgression, according to Sternberg, consisted of its failure to discover the unsafe working conditions on the structural steel.

It has been held that the general contractor's failure to discover and remedy defects does not bar the contractor from seeking indemnity from a party who is more significantly at fault in causing the plaintiff's injuries. (*Gadd v. John Hancock Mutual Life Insurance Co.* (1971), 5 Ill. App. 3d 152, 275 N.E.2d 285.) We need not review again the actions taken by Sternberg to demonstrate that its conduct was considerably greater in contributing to the plaintiff's injuries than was Sheet Metal's failure to discover and remedy the dangers surrounding the structural steel work. A jury question was presented concerning whether there was a "qualitative difference" between the acts of Sternberg and those of Sheet Metal (*Bloodsaw v. Corbetta Construction Co.* (1980), 86 Ill. App. 3d 52, 407 N.E.2d 876; *Zajac v. Illinois Heating & Ventilating Co.* (1980), 82 Ill. App. 3d 1148, 403 N.E.2d 674), and thus we will not disturb their decision that the evidence entitles Sheet Metal to indemnification from Sternberg.

Finally, Sternberg argues that the implied indemnity sought by Sheet Metal in this case is against public policy. In *Davis v. Commonwealth Edison Co.* (1975), 61 Ill. 2d 494, 336 N.E.2d 881, the Illinois Supreme Court held that agreements to indemnify another for liability under the Structural Work Act are unenforceable, according to section 1 of "An Act in relation to indemnity in certain contracts" (Ill. Rev. Stat. 1971, ch. 29, par. 61) and at common law. Arguing from *Davis*, Sternberg asserts that "it takes some judicial sophistry" to prohibit express indemnity under the Structural Work Act while allowing implied indemnity. We do not agree.

A careful reading of *Davis* indicates that it is not the granting of indemnity by a court which violates public policy, but the agreement to allocate the responsibility for a Structural Work Act violation in advance of any such violation. The widespread use of these agreements in the construction industry "may have removed or reduced the incentives to protect workers and others from injury." (61 Ill. 2d 494, 499, 336 N.E.2d 881, 884.) In contrast, no similar difficulties are created if indemnity is granted pursuant to a determination of the relative faults of the parties involved. The courts of this State have upheld indemnity actions based on a violation of the Structural Work Act, as long as there is a pretort relationship between the indemnitor and the indemnitee (*Zajac v. Illinois Heating & Ventilating Co.*), which, in this case, is established by the oral subcontract between Sternberg and Sheet Metal. There is no inconsistency between not enforcing an indemnity agreement under the Structural Work Act and granting indemnity based on the pretort relationship between, and the degree of fault exhibited by, the parties involved. Therefore, the judgment in fa-

vor of Sheet Metal in its indemnity action against Sternberg is affirmed.

CONCLUSION

The judgment denying Sheet Metal indemnity against Carborundum is reversed. The remaining judgments of the Circuit Court of Madison County are affirmed.

Affirmed in part, reversed in part.

KARNS, P. J., and JONES, J., concur.