THE GARFIELD PARK COMMUNITY HOSPITAL, Plaintiff-Appellant, *v.* DR. JOHN J. VITACCO, Defendant-Appellee.

(No. 59842;

First District (1st Division)—April 7, 1975.

Howard and French, of Chicago (Richard French and Stuart Litwin, of counsel), for appellant.

Wildman, Harrold, Allen, & Dixon, of Chicago (Max E. Wildman and James P. Dorr, of counsel), for appellee.

Mr. JUSTICE GOLDBERG delivered the opinion of the court:

The problems presented in this appeal originated on July 3, 1967, when Alonzo Herron, a 9-year-old boy, was struck by an automobile in Chicago. He was taken to the Garfield Park Community Hospital (Hospital). After treatment was completed, suit was filed on behalf of the minor against the Hospital and the treating physician, Dr. John J. Vitacco (defendant), on the ground of alleged negligence during treatment.

The trial before a jury failed to result in a verdict. After 2 days of trial, the Hospital made a settlement and paid $104,000. The trial continued against the defendant doctor. After the jury reported their inability to agree, defendant settled the claim for $71,000. The Hospital then filed a separate action in the circuit court seeking indemnity from defendant on the theory that the negligence of the Hospital was passive and that of defendant was active and also that the Hospital was entitled to indemnity under the doctrine of *respondeat superior*. After trial before a jury, a verdict was returned in favor of the Hospital. However, the trial court granted defendant's motion for judgment notwithstanding the verdict. The Hospital has appealed.

In this court the Hospital argues that it is entitled to indemnity from the doctor on the basic theory that the negligence of the Hospital was only passive while defendant was the active tort-feasor. In addition, the Hospital urges that the defendant doctor was its employee and that he is obliged to indemnify the Hospital on the theory of *respondeat superior*. The defendant responds that the Hospital is not entitled to indemnity because it owed a duty of proper care to the patient which it had breached so that the Hospital was guilty of active negligence. In addition, defendant urges that there should be no indemnity from him to the Hospital under *respondeat superior* because he was not an employee of the Hospital and the Hospital itself was guilty of negligence beyond its responsibility based upon any principal and agent relationship. A factual statement is required.

The injured minor was taken to the emergency room at the Hospital. Defendant was the physician designated by the Hospital for duty in the emergency room that evening. He was compensated by it on an hourly basis for time spent in the emergency room. The Hospital had no employment records for defendant. That evening defendant was not at the Hospital but he had requested Dr. Jamie Ramos to be present in emergency in his stead. Dr. Ramos, an unlicensed house resident employed by the Hospital as a medical technician, examined the patient. After communicating with defendant by telephone and after x-ray examination, Dr. Ramos diagnosed a fracture of the left femur. After further telephone

consultation with defendant, and at his direction, Dr. Ramos had the boy admitted to the Hospital and put him into bilateral Bryant's traction. This apparatus caused both of his legs to be elevated to an acute degree so that the buttocks were raised off the bed. This was accomplished by weights appended to both legs. In accordance with defendant's instructions to Dr. Ramos, a weight of 10 pounds was used on each leg. That same evening, defendant returned to the Hospital, examined the patient and approved of the traction. Defendant remained in charge of the case as the boy's physician.

The Hospital provided a trained nursing staff which was on duty 24 hours each day. The evidence is conflicting as to the specific orders left by defendant with the nurses on the physicians' order sheet. This sheet shows that nurses were to check the patient's vital signs every half hour and record them. Defendant contends that this was sufficient to convey to the nurses that they were to check the legs of the patient for sufficiency of blood circulation. However, the evidence also shows that on the Hospital records the designated vital signs were limited to temperature, pulse, respiration and blood pressure.

The patient remained in traction for 11 days. Defendant saw him every day. The boy's legs were never lowered to a horizontal position. The bandages on his legs were never removed. On July 9, defendant loosened the bandages so that he could examine portions of the patient's legs. This procedure was followed on several subsequent occasions. The defendant testified that he found no reason to change the treatment. On July 12, the defendant ordered additional weight to be added to each leg and this was done. Defendant testified that the blood circulation to the legs was good at that time.

The detailed Hospital records of nurses' notes reveal that the boy's condition was stable from July 3 to July 8. On July 9, the first indication of problems arose. The nurse's notes for the 7 A.M. to 3 P.M. shift indicate: "Dr. Vitacco here L [left] foot edematous" (subject to a swelling caused by an abnormal accumulation of fluid). During the next two days, the nurses' notes reveal that the patient complained of severe pains in both legs and swelling of the right foot. However, the notes stated that circulation remained "good". The initial change in the temperature of the patient's foot, also indicating circulatory problems, occurs in the nurse's notes for the 3 P.M. to 11 A.M. shift on July 12: "Rt. foot sl. swollen and cool to touch."

None of the nurses who had made these notes or participated in the care of the patient testified. Thus, there is no evidence of verbal communication at any time from any of the various nurses to defendant or

to any other person regarding the day-to-day condition of the patient or his symptoms.

During the morning of July 13, Dr. Maurice S. Stamler, an orthopedic surgeon on the Hospital staff, passed the room. He noticed that the patient was "distressed." He entered the room, felt the boy's feet and legs, which he found "cold," removed him from traction and told the nurse to notify the doctor. Some four hours later, Dr. Stamler checked the boy and found the left leg had color, warmth and minimal motion. On the right leg he found sensation still absent from the foot and no motion. While the patient's fractured left leg responded to treatment, the right leg had developed a circulatory deficiency known as ischemic necrosis (death from reduced blood circulation) and subsequently required amputation.

At the trial, the Hospital, seeking indemnity, called three expert witnesses. Dr. David Petty, a qualified surgeon, testified that there were dangers inherent in use of the Bryant's traction. In his opinion, this method was good for use with very small children but is practically useless in treatment of children over 3 years old. He felt that it should not be used on a child 9 years of age but that if it is used for any reason, special daily care and precautions were required such as watching the circulation, bathing and cleaning of the skin. In his opinion, the use of the Bryant's traction in this particular case was not good medical practice. This doctor also testified that changes of color in a limb which might indicate impeded circulation as well as other symptoms, such as cyanosis (a bluish discoloration due to deficiency of oxygen in the blood), coldness and pain, should be noted by the nurses who should notify the doctor and that prompt action was important.

Dr. Maurice S. Stamler, the orthopedic specialist who had come to the rescue of the patient, testified that he personally did not use Bryant's traction because he had seen complications from its use. However, it was his opinion that the use of this system was fairly common and he had seen other doctors use it. He suggested that the nurses should be advised to watch the patient but he testified that regardless of the method of traction used, the patient must "always" be watched. In his opinion, all methods of traction are similar but doctors have different opinions about the type of traction to be used. Bryant's traction was, in his opinion, an accepted medical procedure.

Dr. Donald S. Miller, a highly qualified and educated specialist in orthopedic and vascular surgery, testified that he was of the opinion that the limit in application of Bryant's traction depended upon the age and weight of the patient. He felt that the general age limit should be placed

at about 4 years with the patient's weight in the area of 55 to 60 pounds but it could be used for older children up to 7 who were very thin. He testified that Bryant's traction was one option in the treatment of fractures although he personally would prefer an alternate method in treatment of a child 9 years of age. However, he further stated, in response to a hypothetical question, that Bryant's traction could be used on a child 9 years of age if there was no problem; but where there was evidence of pain or loss of blood supply to the legs, that situation would have to be remedied. He further testified that the Bryant's traction method was very good for treatment of certain age groups but that the weight of the patient was important and the age was secondary. Any method of treatment by traction or by cast made careful watching of the patient necessary. He testified that a registered nurse would be able to recognize circulatory problems by signs such as cold toes, numbness, discoloration, pain or changes of general appearance. It was not only good routine medical practice but also absolutely basic for a registered nurse to notify the doctor immediately upon noting such symptoms. There would be no excuse for failure of a supervisory nurse to notify an attending physician under those circumstances. He felt that it was highly desirable that these symptoms be communicated to the physician when first seen by anyone including the registered nurses.

As regards the weight of the minor, there is no direct evidence but only two estimates. The minor himself testified that at the time he weighed from 60 to 70 or perhaps 75 pounds. Defendant estimated that the minor weighed 60 to 70 or perhaps 90 pounds.

■■■ In determining the rights of these parties, it must first be recognized that a legal duty was owed to the patient by both the defendant and the Hospital. The cases in Illinois are clear and abundant in establishing the physician's duty of reasonable skill and due care in treating his patient. (Note the cited cases in *Borowski v. Von Solbrig*, 14 Ill.App.3d 672, 678, 679, 303 N.E.2d 146.) The duty of a hospital toward its patients is authoritatively set forth in *Darling v. Charleston Community Memorial Hospital*, 33 Ill.2d 326, 333, 211 N.E.2d 253, *cert. denied*, 383 U.S. 946. There, in a case involving the failure of nurses upon a hospital staff promptly to recognize and to react accordingly to impairment of circulation in the patient's leg, the legal duty of the hospital is set forth with complete clarity. The court pointed out that properly skilled nurses would promptly recognize the symptoms of impairment of the circulation in the patient's limb "and would have known that the condition would become irreversible in a matter of hours." The statement follows:

"At that point it became the nurses' duty to inform the attending

physician, and if he failed to act, to advise the hospital authorities so that appropriate action might be taken."

Subsequent decisions by the supreme court following closely in *Darling's* footsteps are *Ohligschlager v. Proctor Community Hospital,* 55 Ill. 2d 411, 303 N.E.2d 392, and *Collins v. Westlake Community Hospital,* 57 Ill.2d 388, 395, 312 N.E.2d 614. In the case before us, both the defendant and the Hospital, in effect, concede the existence of their respective legal duties to the injured minor. The dispute arises as to the qualitative degree of their respective negligence as determination of this question affects the issue of the claim of the Hospital for indemnity from defendant. This issue must be approached by first considering a number of accepted legal principles:

■■ (1) Although the law of Illinois does not permit contribution among joint tort-feasors, it does permit indemnity where the conduct of the indemnitor may be "characterized as the primary cause or active negligence while that of the indemnitee has been characterized as the secondary cause or passive negligence." *Carver v. Grossman,* 55 Ill.2d 507, 510, 511, 305 N.E.2d 161.

■■ (2) Perhaps the most important of these principles is concerned with the meaning of "active" and "passive." In *Moody v. Chicago Transit Authority,* 17 Ill.App.3d 113, 117, 307 N.E.2d 789, this court made the following comment upon the distinction:

"Determination of this question is not a matter of proceeding according to the usual dictionary definitions of the words 'active' and 'passive'. These words are terms of art and they must be applied in accordance with concepts worked out by courts of review upon a case by case basis. Under appropriate circumstances, inaction or passivity in the ordinary sense may well constitute the primary cause of a mishap or active negligence (*Topel v. Porter,* 95 Ill.App.2d 315, 330, 237 N.E.2d 711). It has been appropriately stated that 'mere motion does not define the distinction between active and passive negligence.' (*Trzos v. Berman Leasing Co.,* 86 Ill.App.2d 176, 183, 229 N.E.2d 787.)"

■■ (3) Indemnity is not permitted in favor of a person guilty of active negligence regardless of whether the conduct of the party against whom indemnity is sought is active or passive. In other words, a tort-feasor guilty of active negligence is barred from indemnity regardless of the qualitative degree of the negligence of the remaining tort-feasor and regardless of its legal classification as active or passive. (*Carver v. Grossman,* 55 Ill.2d 507, 514, 305 N.E.2d 161.) The issue here is not whether the conduct of the Hospital was "active" or "passive" negligence in the

dictionary sense but whether it was an active tort-feasor in the legal sense.
■■ (4) Finally, it is inherent in the very nature of indemnity predicated upon the active-passive theory that the facts of the case in which indemnity is sought "must clearly justify indemnification." (*Carver v. Grossman*, 55 Ill.2d 507, 512, 305 N.E.2d 161.) Application of any other rule would "permit the total shifting of responsibility to one negligent party while permitting the other to totally escape the responsibility for his negligent conduct." *Carver*, 55 Ill.2d 507, 512.

Evaluation of the testimony of the three medical experts called by the Hospital is the most important element here. Dr. Petty testified that the use of Bryant's traction by defendant was not good medical practice and the adding of additional weights was similarly categorized. However, Dr. Stamler testified that the use of Bryant's traction was fairly common although he himself did not use it because of the frequency of complications. Dr. Miller·testified that he prefers Russell's traction but that Bryant's traction is one option and it is proper if there is no problem. Neither Dr. Stamler nor Dr. Miller expressed the opinion that the use of Bryant's· traction was not good medical practice in the case at bar. This testimony bore upon the alleged negligence of defendant. However, that is not the controlling issue in this case.

Referring to the principles above set forth, it is apparent that the controversy concerning indemnity actually revolves about the conduct of the Hospital. The determination must be made as to whether the conduct of the Hospital was active or passive. That issue is indeed the decisive question since, as we have seen, if the Hospital is guilty of active negligence, it may not have indemnity from defendant regardless of the quality or degree of his negligence.

Each of the three experts expressed opinions on cross-examination regarding the conduct of the matter by the Hospital. Without a dissenting voice, their testimony was that the symptoms of impaired circulation are coldness of the limb, pain, and change of color or cyanosis. All of them agreed that the detection of these symptoms was a comparatively simple task for registered nurses. They were uniform in expressing the opinion that presence of these symptoms made prompt action imperative and that the nurses should immediately have notified the doctor of their occurrence. Dr. Stamler and Dr. Miller went even further and testified that, regardless of the type of traction used, and even if the limb were enclosed in a cast, it is always necessary for the nurses to use vigilance in detecting the symptoms of faulty circulation and these matters should immediately be brought to the attention of the attending physician.
■■ The testimony of these physicians states precisely the position taken by our supreme court in *Darling* and reiterated in later cases. The

supreme court pointed out that "the medical profession and other responsible authorities regard it as both desirable and feasible that a hospital assume certain responsibilities for the care of the patient." (33 Ill.2d 326, 332.) In the case before us, these responsibilities were manifest and of crucial importance to the welfare of the minor patient. Even untrained laymen realize that circulation of blood must necessarily be impaired if both legs of the patient are held in a vertical position by traction. Assuming that the nurses had reasonable skill, they should promptly have recognized the impairment of circulation and should immediately have informed the attending physician. If no action was forthcoming, they should then have advised "the hospital authorities so that appropriate action might be taken." (33 Ill.2d 326, 333.) The nurses here were fully aware of the dangerous condition and of the serious symptoms as shown by their own notes; yet, no action of any kind was ever taken by any of them.

■■ As above pointed out, the test here does not rest upon the ordinary or dictionary meaning of "active" and "passive." Under the legal definition adopted by the courts in indemnity cases, this complete inaction and passivity by the Hospital staff was active negligence and thus, by court definition, the primary cause of the mishap to the patient. The testimony of the experts here shows that given this type of conduct by the Hospital employees, the same result might reasonably have been expected with the use of other types of traction. Thus the crucial and primary cause of the injury was not so much the conduct of defendant in using Bryant's traction as it was the complete lack of awareness and care by the Hospital staff. The Hospital's own evidence convinces us that Bryant's traction may have been used successfully and without mishap if proper precaution and special care had been taken. In our opinion, the Hospital is not entitled to indemnity from defendant on the active-passive theory.

■■ The contention of the Hospital that it should receive indemnity on the theory that it was simply the principal, so that its liability was predicated solely upon *respondeat superior*, must be rejected. As regards the services rendered by the doctor in treatment of the patient after admission to the Hospital, there is no principal-agent relationship. The Hospital did not pay defendant for his services as attending physician for the injured boy after the latter had been admitted to the Hospital as a patient. The Hospital paid defendant only on a flat hourly basis for time spent in the emergency room without making any of the usual employment deductions such as withholding tax. It had no employment records pertaining to defendant. All elements of the negligence which caused the injury became operative only after the minor was admitted to the Hos-

pital and the concurrent legal duties of the defendant and of the Hospital came into existence.

On the issues of active-passive negligence of the Hospital and the existence of an agency relationship between the Hospital and defendant, all of the evidence when viewed in its aspect most favorable to the Hospital so overwhelmingly favors the defendant that no contrary verdict based on that evidence could be permitted to stand. (*Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill.2d 494, 510, 229 N.E.2d 504.) The trial court acted properly in granting the motion of defendant for judgment notwithstanding the verdict. The judgment appealed from is therefore affirmed.

Judgment affirmed.

BURKE, P. J., and EGAN, J., concur.