RICHARD LONG, Plaintiff, *v.* BUCYRUS-ERIE COMPANY, Defendant.—
(Consolidation Coal Company, Defendant and Third-Party Plaintiff-Appellant
*v.* F & E Erection Company, Third-Party Defendant-Appellee.)

Fifth District   No. 82—100

Opinion filed February 15, 1983.

Dunham, Boman & Leskera, of East St. Louis (Robert D. Francis, of counsel), for appellant.

William Kent Brandon, of Mitchell, Brandon & Schmidt, of Carbondale, for appellee.

JUSTICE JONES delivered the opinion of the court:

Plaintiff Richard Long brought a negligence action against Consolidated Coal Company (Consol) to recover for injuries sustained while working on the construction of a dragline on a mine site owned by Consol. Consol filed a third-party action for indemnity against Long's employer, F & E Erection Company (F & E), which had contracted with Consol to erect the dragline in question.

The jury found for plaintiff Long on the negligence claim, and Consol takes no appeal from the judgment entered against it on that verdict. The jury also returned a general verdict in favor of F & E on Consol's indemnity claim and answered a special interrogatory as to whether Consol was "free from major fault in causing Richard Long's injuries" in the negative. Consol appeals from the judgment in the third-party action, contending that the trial court should have entered judgment in its favor notwithstanding the jury's verdict. Consol also contends that the trial court erred in dismissing its claim against F & E for contractual indemnity. We affirm.

Plaintiff Long was injured on January 24, 1977, when he fell off the base or tub of a dragline being erected on Consol's Burning Star Mine No. 5 near DeSoto, Illinois. Long was a welder employed by F

& E. He worked the second shift, 4 p.m. to midnight. At the time of the accident he was removing snow and ice from the tub in order to uncover a seam to be welded.

A tent-like structure of metal and canvas had been erected over the tub to protect the working parts of the dragline from the weather and to provide covering for the F & E workmen on the tub. The structure did not cover the entire tub but left part of it exposed around the outer perimeter. Along the edge of the tub were tie wires angling in and upward to hold the canvas roof taut. Cloth rags had been attached to the wires to alert those walking in the area of the tie wires. Some of the flags were missing, however, and the tie wires were difficult to see as the lighting was poor.

Long had been chipping ice and snow from the tub for about an hour when the accident occurred. He was facing outward away from the center of the tub. A tie wire, partially covered by snow and un-flagged, was to his right. As Long stepped forward with his right foot, the buckle on his galosh caught the tie wire, and he fell forward. Long grabbed for a rope handrail which had been installed around the circumference of the tub, but the handrail was loose and sagging. Long fell to the snow below and suffered injuries.

Long brought suit against Consol, alleging that Consol exercised control over the construction of the dragline and that it was negligent in failing to provide plaintiff with a safe place to work. Consol in turn sued F & E for indemnity under a theory of active-passive negligence, contending that it was not actively involved in the construction of the dragline and should therefore be allowed to shift the burden of liability to F & E, the active tort-feasor.

It is undisputed that Consol owned both the dragline and the mine site upon which it was being erected. Construction of the dragline was done exclusively by F & E, and all the workers on the site were F & E employees. F & E also provided supervisory personnel, although both Consol and Bucyrus-Erie Company, from which Consol purchased the dragline, had men on the site to oversee the construction. An engineer from Bucyrus-Erie was present for purposes of quality control, while the Consol supervisor was to inspect the work and approve it for progress payments.

Under the terms of the contract between Consol and F & E, Consol had the right to terminate its contract with F & E upon seven days' notice. Consol could also fire the F & E job superintendent if he proved to be unsatisfactory to Consol. All F & E workers, however, were subject solely to the control and supervision of F & E. Further, while the works and materials were owned by Consol, they were un-

der the care and custody of F & E. F & E had the obligation under the contract to keep the job site clean and in a safe working condition, to anticipate the hazards of inclement weather in protecting property and personnel, and to provide safety devices used on the job.

It was Consol's duty under the contract to provide F & E with copies of its safety policy for distribution to F & E employees. Consol had annual week-long safety meetings that F & E employees were required to attend. In addition, Consol supervisor Leonard West attended weekly safety meetings held on the job site for F & E employees. At these meetings West often gave safety orders to F & E personnel. On one occasion, for example, he ordered the grinding down and repainting of the handrails leading up to the tub of the dragline in order to prevent hand and finger cuts caused by the buildup of welds on the handrails. He also ordered that the welders restring their cables to avoid a safety violation resulting from tangled cables and insisted that the heavy equipment operators not run their machines without an alarm bell or a flagman present.

Consol brought Leonard West onto the job as supervisor in late 1976 after one of the two draglines F & E was to erect had been completed. Plaintiff Long testified that F & E had been running behind schedule and Consol had wanted West to represent it at the work site because he had the ability to make demands and get things done. Bucyrus-Erie's quality control man agreed that there had been problems between F & E and Consol as to how things were being done and that West made certain changes. According to plaintiff Long, West would go all over the job site telling the welders, millwrights and iron workers what to do. Sometimes West would give orders directly to the F & E employees and at other times he would give them orders through the F & E foremen.

Shortly after coming onto the job, West gave Jack Hockey, the F & E job superintendent, a list of things which Consol and West wanted F & E to do on the job site. One of these tasks was to cover the dragline's tub and revolving frame. Hockey testified that West had provided the list because F & E was planning to lay off some of its employees, and the list represented suggestions as to how to keep the men busy rather than lay them off. In any event, the tub was covered pursuant to West's request.

Plaintiff Long testified that one night during the second shift the tarp covering the tub began to tear because of the strong wind. Leonard West came into the area where some of the men were eating supper and told Jim Reynolds, the F & E foreman, to shut the job down in order to save the tarp. During the operation to save the tarp,

West gave the orders, and the F & E men, including the foremen and supervisors, worked to tie down the tarp. West did not at that time or at any other time instruct the men to cover the whole tub, although he was aware that workers frequently had to go onto the uncovered part of the tub to remove ice and snow.

On the night Long was injured, he was instructed to go onto the tub to chip the ice and snow off it. The testimony was conflicting as to whether Consol, in the person of Leonard West, was involved in the decision to send Long up on the tub. Long testified as follows:

"A. Well, Leonard turned around and told Jim Reynolds [the F & E foreman]—he said 'Tell Long to go get a chipper and get up on the tub. There was a seam to be filled in but he's got to chip off some ice first.' That was in order to get the seam, of course.

Q. And who gave the orders?

A. Mr. West.

Q. And he said to 'Tell Long to go get the chipper.'

A. He told Jim to tell Long to go get a chipper, that the seam had to be filled in and—the seam up there on the tub.

Q. And Jim Reynolds was your foreman?

A. Yes.

Q. And did he relay those orders to you?

A. Yes.

Q. And did you do what you were told?

A. I was doing what I was told."

Jim Reynolds testified, to the contrary, that West had not told him to send plaintiff up on the tub that night. He denied that West had ever told him what his men should do and stated that he seldom had any contact with West as West was not on his shift. Leonard West himself did not testify as he was deceased at the time of trial.

Upon completion of the testimony the jury returned three special verdicts in the underlying negligence case, finding that there was negligence on the part of defendant Consol which was a proximate cause of damage to plaintiff Long and that there was no negligence on the part of plaintiff Long or Bucyrus-Erie Company, Consol's codefendant. In a general verdict the jury found for the plaintiff and against Consol in the amount of $1.3 million. On the third-party claim the jury found that Consol was not entitled to reimbursement from F & E. The jury responded to a special interrogatory, finding that Consol was not "free from major fault" in causing plaintiff Long's injuries. The court entered judgment on the verdicts and denied Consol's post-trial motion for judgment *n.o.v.*

Consol contends on appeal that under the applicable standard of *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504, the trial court erred in failing to grant judgment *n.o.v.* in its favor on the third-party claim. Consol maintains that the evidence adduced at trial, when viewed most favorably to F & E, established as a matter of law that F & E was in charge of the construction in question so as to render it primarily liable for plaintiff's injuries. Consol points out that not only was F & E contractually responsible for worker safety, but it was also the party that erected the instrumentality (the tent-like structure partially covering the tub) which caused plaintiff's fall. Consol contends, therefore, that its conduct in failing to discover, warn of, or correct the dangerous condition constituted only passive negligence for which it is entitled to indemnity under the doctrine of active-passive negligence.

██ ■ Since the instant cause of action arose prior to March 1, 1978, the indemnity issues in this case are controlled by the traditional rule prohibiting contribution among joint tortfeasors. (See *Skinner v. Reed-Prentice Division Package Machinery Co.* (1977), 70 Ill. 2d 1, 374 N.E.2d 437, *cert. denied* (1978), 436 U.S. 946, 56 L. Ed. 2d 787, 98 S. Ct. 2849; *Lundy v. Whiting Corp.* (1981), 93 Ill. App. 3d 244, 417 N.E.2d 154.) To ameliorate the harshness of this rule, courts have applied a theory of implied indemnity whereby a passively negligent tortfeasor may obtain indemnity from a joint tortfeasor who was actively negligent. (*Carver v. Grossman* (1973), 55 Ill. 2d 507, 305 N.E.2d 161.) Indemnification is available, however, only when there is a qualitative difference between the negligence of the two tortfeasors (*Jackson v. Burlington Northern, Inc.* (1980), 84 Ill. App. 3d 967, 405 N.E.2d 805), and one who is actively negligent will not be allowed to shift responsibility to another person regardless of the relative degree of their negligence. (*Carver v. Grossman; Garfield Park Community Hospital v. Vitacco* (1975), 27 Ill. App. 3d 741, 327 N.E.2d 408; *Goodrick v. Bassick Co.* (1978), 58 Ill. App. 3d 447, 374 N.E.2d 1262.) Moreover, it is inherent in the very nature of indemnity predicated upon the active-passive theory that the facts of the case in which it is sought "must clearly justify indemnification" (*Carver v. Grossman* (1973), 55 Ill. 2d 507, 512, 305 N.E.2d 161, 163) as application of another standard would permit the total shifting of responsibility to one negligent party while permitting the other to escape responsibility for his negligent conduct. *Carver v. Grossman; Garfield Park Community Hospital v. Vitacco.*

██ ■ What constitutes "active" negligence so as preclude the shifting of liability between joint tortfeasors is not susceptible of pre-

cise definition and must often depend upon the facts of a particular case. (*Moody v. Chicago Transit Authority* (1974), 17 Ill. App. 3d 113, 307 N.E.2d 789; see *Chesapeake & Ohio Ry. Co. v. Illinois Central Gulf R.R. Co.* (7th Cir. 1977), 564 F.2d 222.) It is well settled, however, that there can be no indemnification where the party seeking indemnity has breached an affirmative duty to the plaintiff in the underlying action, as the indemnitee's negligence must be of a "technical" or secondary nature. (*Lundy v. Whiting Corp.; Burgdorff v. International Business Machines* (1975), 35 Ill. App. 3d 192, 341 N.E.2d 122.) For instance, one who is technically liable to an injured party under the Structural Work Act (Ill. Rev. Stat. 1981, ch. 48, pars. 60 through 69) may be entitled to indemnity from the active tort-feasor where his conduct was merely a minor or secondary cause of the injury. (*Miller v. DeWitt* (1967), 37 Ill. 2d 273, 226 N.E.2d 630; *Lambert v. D. J. Velo & Co.* (1971), 131 Ill. App. 2d 30, 268 N.E.2d 170.) In the instant case, however, the basis of the plaintiff's underlying negligence action was that Consol had breached an affirmative duty of care that arose because of the degree of control Consol asserted over the work project. In rendering its verdict for plaintiff Long, the jury necessarily determined that Consol had breached such a duty owing to the plaintiff. Under these circumstances, Consol is bound by the jury's finding and is estopped from denying that its negligence substantially contributed to the plaintiff's injuries. See *Crum v. Gulf Oil Corp.* (1979), 70 Ill. App. 3d 897, 388 N.E.2d 1008.

The court in *Preston v. National Broadcasting Co.* (1971), 133 Ill. App. 2d 200, 272 N.E.2d 700, considered the effect of a finding of negligence in the principal action upon a subsequent indemnity action. The court there held that:

> "[A]n indemnitee, in his action to recover from the indemnitor the amounts paid in satisfaction of a judgment obtained against him by an injured person, is bound by all findings without which the judgment could not have been rendered, and *** if the judgment in the earlier action rested on a fact fatal to recovery in the action over against the indemnitor, the latter action cannot be successfully maintained. [Citation.]" (133 Ill. App. 2d 200, 203, 272 N.E.2d 700, 702.)

To the same effect is the court's holding in *Crum v. Gulf Oil Corp.*, where the jury entered its verdict for the plaintiff in the underlying negligence action, finding in a special interrogatory that the defendant/third-party plaintiff was actively negligent in causing the plaintiff's injuries. The court noted that since the judgment in the underlying case established as a matter of law that the defendant/third-party

plaintiff was actively negligent, its suit for indemnity was therefore barred and the third-party plaintiff was "estopped from denying that its negligence substantially contributed to [the original plaintiff's] injuries." *Crum v. Gulf Oil Corp.* (1979), 70 Ill. App. 3d 897, 902, 388 N.E.2d 1008, 1013; see *Chesapeake & Ohio Ry. Co. v. Illinois Central Gulf R.R. Co.; Lundy v. Whiting Corp.*; but see *Richard v. Illinois Bell Telephone Co.* (1978), 66 Ill. App. 3d 825, 383 N.E.2d 1242.

■ The evidence adduced at trial in the instant case showed that Consol, through its supervisor Leonard West, actively participated in the construction of the dragline on which the plaintiff was injured. West made suggestions to the F & E foremen concerning tasks to be performed on the work site and sometimes gave direct orders to the F & E employees. There was testimony to the effect that Consol through West was involved in the decision to erect the tent-like structure over the tub from which the plaintiff fell and that it was pursuant to indirect instruction from West that the plaintiff was on the tub on the night in question. There was also testimony that Consol, through West and others, involved itself in certain aspects of worker safety. Though some of this evidence was controverted, it was the function of the jury to resolve factual issues regarding the credibility of the witnesses and the weight of the evidence. (*Spidle v. Steward* (1980), 79 Ill. 2d 1, 402 N.E.2d 216.) The jury found, on the basis of this testimony, that Consol's role in the work project was sufficient to raise a duty of care on its part toward the plaintiff which it subsequently breached. The jury also found in its answer to the special interrogatory that Consol's negligence was not merely passive but constituted "major fault." (*Cf. Peoples v. Granite City Steel Co.* (1982), 109 Ill. App. 3d 265, 440 N.E.2d 363, where, under facts showing a similar involvement on the part of a supervisor, the jury properly found that defendant's conduct constituted "major fault" in causing plaintiff's injuries.) These facts, and the verdict based thereon, conclusively establish that Consol was guilty of active negligence in causing the plaintiff's injury and that it therefore is not entitled to indemnity from third-party defendant F & E. The trial court accordingly did not err in refusing to grant judgment *n.o.v.* for Consol in its action based on implied indemnity.

■ Consol additionally contends that the trial court erred in dismissing its claim against F & E for contractual indemnity. This claim is based on Article IX of the contract between Consol and F & E, which states in pertinent part:

> "*** Contractor [F & E] agrees that it shall use extreme care, that is, care beyond that ordinarily required, in the per-

*formance of its work [under the contract.]* Contractor shall adequately protect the materials, the work, persons working on the premises, the general public and any adjacent property and Contractor shall assume all risks of the premises and will indemnify and hold harmless Consol, its directors, officers, employees and agents from and against any and all claims and/or demands including all costs and expenses, including attorneys fees, for injury or alleged injury or death to persons, or damage to property, caused by, arising from, incidental to, connected with or growing out of the work to be performed under this Construction Agreement, including, but not limited to, any work to be performed by any subcontractor or agent of Contractor." (Emphasis added.)

The trial court found that the provision holding F & E to a standard of extreme care beyond that ordinarily required could permit Consol to be indemnified for its own negligence and held that it was thus void under section 1 of "An Act in relation to indemnity in certain contracts" (Act) (Ill. Rev. Stat. 1979, ch. 29, par. 61). This act prohibits as against public policy construction contract agreements that allow a party to escape liability for its own negligent acts. Consol contends, however, that the clause in question is not invalid under the Act as it does not specifically require F & E to indemnify Consol for its own negligence.

Consol relies in its appeal upon the rule of strict construction of indemnity contracts set forth in *Westinghouse Electric Elevator Co. v. LaSalle Monroe Building Corp.* (1946), 395 Ill. 429, 70 N.E.2d 604. The court there held that an indemnity contract should not be construed as indemnifying one against his own negligence absent clear and explicit contractual language to that effect. (See *Zadak v. Cannon* (1974), 59 Ill. 2d 118, 319 N.E.2d 469; *Schuch v. University of Chicago* (1980), 87 Ill. App. 3d 856, 410 N.E.2d 258.) This rule was invoked prior to the enactment of section 1 of the Act to limit the enforcement of such contractual provisions so as to insure that one agreeing to the extraordinary liability of indemnifying another against his own negligence was fully aware of the extent of his liability. (See *Cox v. Lumbermens Mutual Casualty Co.* (1982), 108 Ill. App. 3d 643, 439 N.E.2d 126.) While the rule still applies to indemnity provisions not covered by the Act, there is no longer any reason for the rule where clauses in the construction industry are concerned, and the *Westinghouse* rule is ineffective as to these provisions. *Cox v. Lumbermens Mutual Casualty Co.*

Consol argues, however, that the clause in question merely pro-

vides indemnity for negligent acts of F & E and that Consol is entitled to indemnity under the contract because its own liability is derived from F & E's negligence in failing to provide plaintiff a safe place to work. As noted by the trial court, the standard of care set forth in the clause in question was greater than that required for ordinary negligence. Under the agreement, then, Consol could hold F & E to an extreme degree of care and escape liability for its own negligence. This it is prohibited from doing under the statute. If, on the other hand, we were to accept Consol's argument that the clause does not indemnify it for its own negligence, then Consol would have no claim for indemnity under the contract because its liability toward the plaintiff was based solely in negligence. (*Cf. Schuch v. University of Chicago,* where the court upheld a clause providing indemnification for violations of the Structural Work Act since one can be technically liable under that Act for conduct which is less than negligent. But see *Cox v. Lumbermens Mutual Casualty Co.*) In either event Consol cannot free itself of the fact of its own negligence by invoking the contract terms. We find therefore that Consol had no claim for contractual indemnity from F & E and that the trial court did not err in dismissing that count of its third-party complaint.

For the foregoing reasons we accordingly affirm the judgment of the trial court in favor of third-party defendant F & E.

Affirmed.

KASSERMAN and KARNS, JJ., concur.