PLAYSKOOL, INC., Plaintiff, v. ELSA BENSON, INC., f/n/a Ragnar Benson, Inc., Defendant and Third-Party Plaintiff-Appellant (CST Construction Company *et al.*, Third-Party Defendants-Appellees).

First District (1st Division) No. 84—1505

Opinion filed August 25, 1986.

Gordon B. Nash, Jr., of Chicago (G. Andrew Watson, of Gardner, Carton & Douglas, of counsel), for appellant.

Barry G. Bollinger and Francis R. Petrek, Jr., of Chicago (Timothy G. Nickels, Jeremiah P. Connelly, and Randy J. Curato, all of Wildman, Harrold, Allen & Dixon, of counsel), for appellee CST Construction Company.

Vincent C. Cipolla, of Kurnik & Cipolla, of Arlington Heights (Joseph B. Lederleitner, of Pretzel & Stouffer Chartered, of counsel), for appellee Midwest Concrete Products.

Schaffenegger, Watson & Peterson, Ltd., of Chicago (Donald G. Peterson, of counsel), for appellee Blakeslee-Midwest Prestressed Concrete Company.

JUSTICE BUCKLEY delivered the opinion of the court:

Plaintiff, Playskool, Inc., filed a complaint against Ragnar Benson, Inc., seeking damages for breach of contract and fraud in connection with the construction of a manufacturing/warehouse facility. Ragnar Benson, in turn, filed a third-party action against CST Construction Company, Midwest Concrete Products and Blakeslee-Midwest Prestressed Concrete Company seeking indemnity for its liability to Playskool. At the close of Ragnar Benson's case, the trial court entered directed verdicts in favor of all third-party defendants. Ragnar Benson, now Elsa Benson, Inc. (Benson), appeals this ruling. For the following reasons, we affirm.

Benson is engaged in the business of providing architectural, engineering and general-contracting services. CST Construction Company (CST) erects buildings. Midwest Concrete Products (Midwest) and Blakeslee-Midwest Prestressed Concrete Company (Blakeslee) manufacture precast concrete components.

In December 1972, Playskool and Benson entered into a contract whereby Benson agreed to design and construct a two-story warehouse adjacent to Playskool's existing manufacturing facility at 4501 West Augusta Boulevard in Chicago. The new facility was to be designed to connect into and become an integral part of the existing facility. Certain basic criteria for the project were provided to Benson by Playskool, including the size and purpose of the building and the fact that the building's second floor was to have a live-load–bearing capacity of 175 pounds per square foot on the second floor.[1]

---

[1] The term "live load" refers to the amount of additional weight that can be superimposed on the structure. In engineering practice, it is designated as so many pounds per square foot.

Pursuant to a provision in its contract with Playskool authorizing the use of subcontractors, Benson entered into a contract with CST wherein CST agreed to design, provide and install precast concrete beams and other structural members for the precast concrete second floor of the proposed facility. CST, in turn, subcontracted with Midwest and Blakeslee to design and fabricate various component parts for the second-floor system. Specifically, Midwest was to design and fabricate precast concrete ledger beams and columns to be used in the construction. Blakeslee was to design and fabricate precast concrete double-T beams for the project.

During the preerection stage of the project, Midwest and Blakeslee prepared shop drawings which were reviewed by Benson, as the architect/engineer of record. The shop drawings provided the dimension, materials and placement of reinforcement for the various concrete components. Certain shop drawings also provided detail as to the manner of connecting the components. Ultimately, Benson's engineering department approved each and every shop drawing in final form.

Following approval of the drawings, the precast system was erected by CST. Joseph Galassi, CST's job superintendent on the site, was accountable to Jack Bavarro, Benson's job superintendent, who was present each day of the entire construction. Galassi was also accountable to Gunnar Nelson, Benson's project manager. Joseph Pfendt, Benson's vice-president of construction, testified at trial that Bavarro and Nelson both had the duty to inspect not only the construction but also the materials. They also had the obligation to reject any materials which did not comply with the specifications and shop drawings. The construction went without incident and the precast phase of the construction was completed by February 1973.

After the construction work was finished by CST, the concrete topping which was to provide the surface for the second floor was poured by Kalman Floor Company (Kalman), a subcontractor hired by Benson. Subsequently, the walls were constructed by Benson's own employees. The second floor was framed and the roof was constructed by Benson's employees.

Playskool took possession of the new facility in December 1973. Early in 1974, however, separation occurred between the second floor and one of the outside walls. During 1974 and 1975 the separation increased in dimension and additional separations began to appear in other areas of the second floor along the same wall. In an attempt to remedy the situation, Benson installed metal brackets between the east wall of the building and the second floor. The restraints were in-

effective and the separations continued.

Also during 1974, cracking developed in the second floor. Kalman, the firm which installed the concrete floor over the double-T beams, was brought in by Benson to repair the cracks. The repairs were insufficient, as the cracking continued into 1975 when a hole developed through the second floor.

Playskool asked Benson to make a recommendation as to what was needed to rectify the situation. Benson thereafter made recommendations relating to the cracks in the floor. Although all but one of the recommended repairs were implemented, the problems continued.

In February 1976, Playskool experienced its first incident of "spalling," a phenomenon involving concrete separating from the base of the ledger beam and falling to the first floor. Benson immediately inserted timber shoring at the points of failure and agreed to investigate. Subsequently, Joseph Pfendt, Benson's vice-president, inspected the site and then wrote a letter to Playskool dated March 8, 1976, in which he stated that "substantial evidence exists that virtually all the problems which plague and afflict your building are directly traceable to the destructive presence of the forklift trucks on the second floor."

The following week, however, Pfendt wrote a letter to Joseph Nuzzo of CST in which he gave different reasons as to the causes of the spalling. In that letter, he stated that the "root causes" consist of the following: (1) improperly located or omitted reinforcing steel; (2) inadequate bearing of "double-T" beams upon "inverted T" beam shelves; (3) irregularity of bearing surfaces; and (4) deficiencies in the length of "double-T" beams.

In May and July 1976, meetings were held between Benson, CST, Blakeslee and Midwest concerning implementation of a repair program. Following the meetings, 59 steel brackets were installed at locations where spalling was evident. Despite these repairs, problems persisted at the new facility. In early 1977, another spalling incident occurred.

Consequently, in April 1977, Playskool filed a complaint against Benson, alleging that as a result of Benson's defective design, construction and installation, Playskool has been and will be forced to curtail normal manufacturing and storage operations at the new facility. In its final form, Playskool's complaint against Benson contained three counts. Count I alleged breach of contract and sought $9,500,000 in damages. Count II alleged breach of an implied warranty of fitness and sought damages in the same amount. Count III alleged that Benson committed fraud by not informing Playskool of the construction defects which were known or should have been

known to it, and further by advising Playskool that Playskool had caused the spalling when, in fact, Benson knew otherwise.

Benson, in turn, filed a third-party action against CST, Midwest and Blakeslee seeking indemnity for any and all amounts for which Benson is held liable to Playskool.[2]

At trial, Playskool presented expert testimony as to the cause of the problems plaguing the new facility. Ian Chin of the engineering firm of Wiss, Janney & Elstner testified that the following factors caused the spalling: (1) lack of an expansion joint in the building; (2) absence of neoprene bearing pads between the double-T and the top of the ledger beams; (3) short bearing surfaces; (4) inadequate reinforcing steel in the ledges of the ledger beams; (5) air pockets on the top of the ledger beam surfaces where the double-Ts sit; and (6) inclination of the ledger beam bearing surface and double-T member.

Chin further stated that in 1981 his firm's inspections uncovered cracks in the double-T beams. In his opinion, the cracking was caused by the lack of a proper connecting between the double-T members and also the possible lack of "composite action" between the concrete topping slab and the double-T members. Composite action means that the topping slab and the double-T are interconnected so they work as a unit.

Playskool also presented the expert testimony of Eugene Holland, president of Eugene Holland & Associates, Inc., a consulting engineering firm. Holland testified there was faulty design and construction in the walls, the second-floor system and the roof of the facility. In his opinion, the architect-engineer of record, who in this case was a Benson employee, was responsible for the building. He agreed that the architect of record would be totally responsible for the "allocation of design requirements of various aspects of the building and the interfacing of those aspects." Holland also testified that it would cost $5,800,000 to repair the building.

In addition to the above expert testimony, Playskool and Benson presented the testimony of various officers and employees of the parties involved in this litigation.

At the conclusion of the evidence presented by Playskool and Benson, third-party defendants CST, Blakeslee and Midwest informed the court that they were not going to call any witnesses and moved for a directed verdict against Benson. The trial court granted their

---

[2]Benson subsequently attempted to add Kalman as a third-party defendant, but its motion to do so was denied. Consequently, Benson sued Kalman in a separate action now pending in the circuit court of Cook County.

motion, reasoning in part as follows:

> "I note the evidence is overwhelming that first under its contract with Playskool Ragnar Benson had full directing authority over the work. Ragnar Benson was not just an ordinary general contractor but had both design and build responsibility, with both the power and duty of approval."

Playskool's case against Benson went to the jury. A verdict was returned in favor of Playskool on all three counts of its complaint. The jury found compensatory damages in the amount of $5,756,475 and punitive damages on the fraud count in the amount of $2,590,414.

The trial court denied all post-trial motions, including those relating to the directed verdicts in favor of the third-party defendants, but did grant a motion for a remittitur on the punitive damages and reduced the punitive damages to $1,600,000. Benson has settled with Playskool, but appeals from the final judgment with respect to the third-party defendants.

I

■■ On appeal, Benson first argues that the trial court erred in directing a verdict against it on its claim for implied indemnity against CST, Midwest and Blakeslee. We disagree. "Indemnity is a common law doctrine which shifts the entire responsibility from one tortfeasor, who has been compelled to pay the loss, to another tortfeasor who is truly culpable."[3] (*Smith v. Clark Equipment Co.* (1985), 136 Ill. App. 3d 800, 804, 483 N.E.2d 1006; see also Prosser, Torts sec. 51, at 310 (4th ed. 1971).) Indemnity can be express, arising out of the agreement of the parties, implied by operation of law, or implied by the courts based upon the theory of active-passive negligence. *Morizzo v. Laverdure* (1984), 127 Ill. App. 3d 767, 469 N.E.2d 653.

■ Here, Benson is pursuing an implied-indemnity claim against CST, Midwest and Blakeslee based on an active-passive negligence theory. Under this theory, a passively negligent tortfeasor may obtain indemnity from a joint tortfeasor who was actively negligent. (*Carver v. Grossman* (1973), 55 Ill. 2d 507, 305 N.E.2d 161.) However, if the tortfeasor seeking indemnity was in any way actively negligent, indemnity will not be granted despite the active negligence of the party

---

[3]Because the present cause of action arose prior to March 1, 1978, the indemnity issues in this case are controlled by the traditional rule prohibiting contribution among joint tortfeasors. See *Skinner v. Reed-Prentice Division Package Machinery Co.* (1977), 70 Ill. 2d 1, 374 N.E.2d 437, *cert. denied* (1978), 436 U.S. 946, 56 L. Ed. 2d 787, 98 S. Ct. 2849; *Long v. Bucyrus-Erie Co.* (1983), 112 Ill. App. 3d 578, 445 N.E.2d 934.

from whom indemnity is being sought. (*Sears v. Kois Brothers Equipment, Inc.* (1982), 110 Ill. App. 3d 884, 443 N.E.2d 214.) What constitutes "active" negligence so as to preclude the shifting of liability between joint tortfeasors is not susceptible of precise definition and must often depend upon the facts of a particular case. *Moody v. Chicago Transit Authority* (1974), 17 Ill. App. 3d 113, 307 N.E.2d 789.

In the present case, the evidence before us overwhelmingly establishes active negligence on the part of Benson. As the trial court correctly found, Benson, in accordance with its contract with Playskool, had full directing authority over the Playskool project. Benson had both design and build responsibility, with the power and duty of approval. The architect of record was an employee of Benson. Supervisors of Benson were on the job site during the entire project to coordinate the work and had both the power and responsibility to stop work and reject materials. In fact, Benson itself performed a substantial part of the construction for the new facility.

In its own brief, Benson provides a list of failures for which it admitted responsibility at trial through the testimony of its former officers and employees. The following are only a few examples of these failures and admissions: (1) "lack of composite action in the double-Ts"—Lewis Townsend, vice-president of engineering at Benson, admitted that Benson was responsible to ensure that composite action was achieved at the connection of the second-floor slab and the double-T flanges; (2) "the absence of bearing pads"—James Ratzer, who was in charge of the structural engineering department at Benson, admitted approving the erection drawings which did not call for bearing pads at the double-T to ledger-beam connections; (3) "failure to properly connect the double-Ts"—Ratzer testified that Benson had approved the erection drawings which did not detail the connection of the double-Ts and ledger beam; (4) "the absence of an expansion joint"—Townsend admitted that Benson approved the removal of the expansion joint that had been called for in the original plans; and (5) "failure to calculate the capacity of second floor systems"—Townsend admitted that his structural department first calculated the actual theoretical second-floor capacity only after the first episode of spalling had been reported.

Further negligent conduct on the part of Benson was disclosed through the expert testimony of engineering consultant Eugene Holland. His testimony revealed, among other things, as follows: (1) Benson approved a design which resulted in the second floor having a live-load–bearing capacity of 68 pounds per square foot rather than the owner's required 175 pounds per square foot; (2) Benson did not

properly connect the south wall to the roof, second floor and ground slab; (3) Benson should have placed two expansion joints in the roof of the building; the roof was erected by Benson's own employees; (4) Benson did not properly place drains on the roof. The lack of drains resulted in a tendency for ponding to develop. The ponding led to leaks in the roof which damaged Playskool's stock; and (5) Benson did not properly connect the interior masonry walls to the exterior brick walls, thereby resulting in the walls' failure to act together as a unit, similar to the lack of composite action in the topping slab explained previously herein.

The record is replete with other examples of active negligence on the part of Benson. We note that Benson, in arguing that its negligence was only passive, maintains that it relied on CST's expertise in obtaining the precast materials and properly installing them. Benson urges that CST was responsible for checking the plans and determining the requirements of the work to be performed. This argument is unpersuasive. Benson, as an architect, is not relieved of responsibility merely because it hired a subcontractor to furnish and erect some of the building materials. In *St. Joseph Hospital v. Corbetta Construction Co.* (1974), 21 Ill. App. 3d 925, 316 N.E.2d 51, this court described the scope of an architect's responsibility as follows:

" 'Architects and engineers hold themselves out as competent to produce work requiring: (a) skill in the preparation of plans, drawings or designs suitable for the particular work to be executed; (b) knowledge of the materials to be used and the proper application for use; (c) knowledge of construction methods and procedures. Presumably, if the architect or engineer fails to use reasonable care to produce a satisfactory structure, he may be sued either for a breach of an implied term of his contract or in negligence ***.' " (21 Ill. App. 3d 925, 943, quoting Bell, *Professional Negligence of Architects & Engineers*, 12 Vand. L. Rev. 711, 715-16 (1959).)

In response to the architect's argument that he was not responsible for the installation of improper material, we stated as follows:

" 'It ill behooves a man professing professional skill to say I know nothing of an article which I am called upon to use in the practice of my profession.' " 21 Ill. App. 3d 925, 943, quoting *Scott v. Potomac Insurance Co.* (1959), 217 Ore. 323, 334, 341 P.2d 1083, 1088.

Hence, whether or not Benson had sufficient knowledge of precast-concrete-construction requirements when building the Playskool facility is not important. The fact is that Benson should have had such

knowledge. Benson suggested the precast system to Playskool and as architect retained the right of approval over all of the precast drawings. It is difficult to imagine a party more actively involved in the construction process than Benson was in the case before us.

■ A trial court should award a directed verdict "in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.) Clearly, this standard was satisfied in the present case with regard to whether Benson was actively negligent. Accordingly, we affirm the directed verdict entered against Benson on its claim for implied indemnity against CST, Midwest and Blakeslee.

## II

■ Next, Benson argues that the trial court erred in directing a verdict on its claim for contractual indemnity against CST. This claim is based on clause B of the contract between CST and Benson which provides, in pertinent part, as follows:

> "Subcontractor [CST] shall indemnify and save harmless the Contractor [Ragnar Benson] and the Owner [Playskool] from any and all liens, claims, obligations or liabilities which may be asserted against the Contractor, Owner or their property by reason of or as a result of any acts or omissions of the Subcontractor, his employees, representatives, licensees, or subcontractors, in connection with or related to the performance of this Agreement."

Relying on the above clause, Benson alleged in count I of its third-party complaint and at trial that it was entitled to complete indemnification from CST in an amount equal to any judgment entered against it in the underlying action brought by Playskool.

The trial court, in directing a verdict on the contractual-indemnity claim noted that "for an indemnity you need an individual non-severable amount to pass along" and found no such indivisible damage in this case. The court further reasoned:

> "I find in this case that contractual indemnity *** cannot be enforced under the evidence of this case, because that would have the effect of allowing Ragnar Benson to indemnify itself against its own negligence. In my view that would violate public policy ***. It is no aid to Ragnar Benson to say that somebody else's conduct may also have been active."

We believe that the trial court ruled correctly. Cases applying in-

demnity principles have involved a single and indivisible injury where the evidence showed that the subcontractor had sole responsibility for the alleged injury. (See, *e.g., Rynders v. Sangamo Construction Co.* (1982), 103 Ill. App. 3d 552, 431 N.E.2d 1357; *Jones v. McDougal-Hartmann Co.* (1969), 115 Ill. App. 2d 403, 253 N.E.2d 581.) In *Jones,* the court imposed indemnity upon a subcontractor for a single injury which was "incident to the performance of a subcontract, and there is no participation by the general contractor in such performance." 115 Ill. App. 2d 403, 408, 253 N.E.2d 581.

In the present case, clause B of the Ragnar Benson/CST contract is not applicable because the evidence at trial did not show a single indivisible damage for which indemnification was warranted. As established above, there was evidence that various aspects of the warehouse construction were deficient—aspects which did not involve CST. Indeed, Benson is pursuing an action against Kalman Floor Company for damages in connection with the second-floor slab. There was also ample evidence showing that Benson's own misconduct permeated the design and construction phases of the Playskool project. As a result, the trial court correctly found no single injury subject to contractual indemnity.

Additionally, as the trial court noted, recovery under the indemnification clause would violate public policy of this State. This policy has been codified in "An Act in relation to indemnity in certain contracts" (Ill. Rev. Stat. 1985, ch. 29, par. 61), which provides that agreements to indemnify or hold harmless another person from that person's own negligence are void as against public policy and wholly unenforceable. This statute was enacted in 1971 as a codification of long-standing common law policy in Illinois discouraging clauses that attempt to insulate one from his own negligence. (*American Pecco Corp. v. Concrete Building Systems Co.* (N.D. Ill. 1975), 392 F. Supp. 789.) As such, to permit Benson to use clause B as a complete shield from its gross negligence would violate the policy underlying the indemnity statute.

■ We observe that Benson is attempting on appeal to change its theory regarding its contractual-indemnity claim in count I of its complaint. Benson, in its appellant brief, contends that in count I it "was not seeking to enforce an 'agreement' to indemnify itself from its own negligence." Rather, Benson urges that count I actually sought damages for breach of CST's contractual promise to provide a precast system with a load limit of 175 pounds per square foot.

After reviewing Benson's fifth amended complaint, we find no support for its argument above. Illinois is a fact-pleading State, which

means that, although pleadings are to be liberally construed and formal allegations are not necessary, a complaint must contain facts to state a cause of action. (*MBL (USA) Corp. v. Diekman* (1985), 137 Ill. App. 3d 238, 484 N.E.2d 371.) Here, count I does not contain facts setting forth a cause of action for breach of contract, but instead seeks total indemnification from CST based upon clause B. Specifically, in count I Benson alleges that: (1) in clause B, CST has agreed to "indemnify and save harmless [Ragnar] Benson"; (2) Benson has demanded indemnification from CST; and (3) if Playskool recovers against Benson based on its negligence and breach of contact counts, then "Benson is entitled to indemnity from CST." On these pleadings, we must reject Benson's argument that it is not seeking contractual indemnity, but merely damages for breach of contract. Accordingly, the trial court is affirmed as to its ruling on the contractual-indemnity claim.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

QUINLAN, P.J., and CAMPBELL, J., concur.